Kristianne M. BOYD, Plaintiff–
Appellant,

v.

BENTON COUNTY; City of Corvallis;
William Ellison; Scott Bressler; Dave
Reed; Tom Cook; Ryan Moody; John
Chilcote; Allen Schermerhorn; David
Scott; Shawn Houck; Ken Rueben;
Dennis Carson, as supervisor in his
official capacity; Chris Skinner, as
supervisor in his official capacity, De-
fendants–Appellees.

Kristianne M. Boyd, Plaintiff–
Appellant,

v.

Benton County; William Ellison; Scott
Bressler; Dave Reed; Tom Cook;
Ryan Moody; John Chilcote; Allen
Schermerhorn; David Scott; Chris
Skinner, as supervisor in his official
capacity, Defendants,

and

City of Corvallis; Shawn Houck; Ken
Rueben; Dennis Carson, as supervisor
in his official capacity, Defendants–
Appellants.

Nos. 02–35776, 02–35777.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 5, 2004.

Filed June 28, 2004.

Ridgway K. Foley, Jr., Greene & Markley, PC, Portland, OR; James D. Vick, Alex C. Dunn, Vick & Conroyd, LLP, Salem, OR, for the plaintiff-appellant-cross-appellee.

Robert E. Franz, Jr., Springfield, OR, for the defendants-appellees-cross-appellants.

Janet M. Schroer, Marjorie A. Speirs, Hoffman, Hart & Wagner, LLP, Portland, OR, for the defendants-appellees.

Before: McKEOWN, FISHER, Circuit Judges, and GONZALEZ, District Judge.*

GONZALEZ, District Judge:

Kristianne Boyd brought suit under 42 U.S.C. § 1983 against members of the Corvallis Police Department ("CPD") and the City of Corvallis (the "City") (together the "City defendants") and members of the Benton County SWAT Team and Benton County (together the "County defendants") (collectively, "Defendants") for vio-

---

* The Honorable Irma E. Gonzalez, United States District Judge for the Southern District of California, sitting by designation.

lation of her Fourth Amendment rights during the execution of a search warrant. Specifically, Boyd argues that the use of a "flash-bang" device constituted excessive force under the circumstances. The flash-bang grenade is a light/sound diversionary device designed to emit a brilliant light and loud noise upon detonation. Its purpose is to stun, disorient, and temporarily blind its targets, creating a window of time in which police officers can safely enter and secure a potentially dangerous area. On summary judgment, the district court found that all individual defendants were entitled to qualified immunity and that Boyd's *Monell*[1] claim against the City of Corvallis failed for lack of evidence. On appeal, Boyd challenges the district court's findings as to both qualified immunity and her *Monell* claim. Defendants cross-appeal, arguing that the district court should have granted qualified immunity on alternative grounds. We conclude that the district court properly found a material issue of fact as to whether Boyd's Fourth Amendment rights were violated, and properly determined that these rights were not clearly established at the time of the injury. We also conclude that Boyd's *Monell* claim was properly denied on summary judgment. We therefore affirm the district court.

# I.

## BACKGROUND

Viewed in the light most favorable to Boyd, the non-moving party on summary judgment, the record yields the following facts:

On October 10, 1997, two suspects stole jewelry, cash, and a .357 magnum revolver during an armed robbery of a jewelry store in Corvallis, Oregon. Witnesses described one suspect as a Caucasian male who walked with a limp and the other as a Hispanic male of average height. Witnesses also recalled that the Hispanic suspect used a firearm in the course of the robbery. As the suspects fled the scene in a blue Geo Metro, the store owner fired shots at the vehicle, one of which struck and shattered a window.

A few days after the robbery, CPD officers were contacted by a confidential informant. The informant claimed to have overheard a Mr. Dalebout bragging about his involvement in a jewelry store robbery and mentioning the Geo. The informant also identified two residences where he believed Dalebout could be found. One of these locations was a one-bedroom apartment on Pickford Street in Corvallis. Finally, the informant told officers that a man known as "Mexican Charlie" resided at the Pickford Street apartment and that Dalebout frequented that location to "hang out" and do drugs. Police records confirmed that a Charlie Switzler, who appeared to be Hispanic or Latino, resided at the apartment. Officers also learned that Switzler had a prior encounter with law enforcement involving a domestic assault at the apartment.[2]

Based on the informant's tip, CPD officers began surveillance of the Pickford Street apartment. During their surveillance, officers observed a blue Geo Metro with a shattered window in the parking lot of the apartment complex. Officers also observed several people frequently enter-

---

1. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (holding that municipalities may be liable under section 1983 if a constitutional violation was the product of an official policy or a failure to train employees).

2. It cannot be conclusively established from the record whether Switzler was the victim of the assault or whether he was an assailant.

ing and exiting the apartment. Eventually, Dalebout and a Mr. Knudsen exited the apartment, entered the Geo Metro, and began to drive away. Both Dalebout and Knudsen appeared to be Caucasian and Knudsen walked with a noticeable limp.

Believing that Dalebout and Knudsen could be connected with the robbery, officers pursued the Metro out of the apartment complex. After a high-speed chase, the officers successfully stopped the vehicle and took Dalebout and Knudsen into custody. Dalebout had a firearm in his possession and another firearm was discovered inside the vehicle.[3] Additionally, Dalebout swallowed a quantity of methamphetamine and a ring before the officers could apprehend him. Knudsen was later identified by the store owner as the Caucasian male who participated in the robbery.

Following their encounter with Dalebout and Knudsen, CPD officers requested and received a search warrant authorizing them to search the Pickford Street apartment for the remainder of the stolen jewelry and the .357 magnum. After discussing the matter, the CPD officers decided to enlist the aid of the Benton County SWAT Team to secure the apartment before conducting the search. The morning of the search, officers of the CPD and the Benton County SWAT Team gathered for a briefing. The officers discussed various circumstances surrounding the operation, including the following: an armed robbery suspect (the Hispanic suspect) was still at large and could have been inside the apartment; the .357 magnum had yet to be recovered and might have been in the possession of someone inside the apartment;

they had obtained information that another individual connected with the apartment had attempted to purchase an "SKS" assault rifle; two armed individuals, who attempted to evade police, had been seen exiting the apartment a short time beforehand; the apartment had a loft from which a shooter could have placed the officers in a vulnerable position as they entered the apartment; and there was a possibility that five to eight people would be sleeping inside the apartment.

In light of these circumstances, Sergeant Skinner, the SWAT Team supervisor, determined that a flash-bang device should be used to gain entry and secure the premises. The manner of deploying the flash-bang was also discussed, taking into account the fact that several people might be sleeping in the apartment at the time of entry. Eventually, Sergeant Skinner determined that the flash-bang should be deployed against the apartment's front wall and near the door because he felt that the risk of someone sleeping there was minimal. Volunteer Deputy Ellison was chosen to deploy the flash-bang. Every CPD officer involved in the operation knew of the plan to use the flash-bang, did not object to that plan, and actively participated in its operation.

The officers executed the search in the early morning hours of October 14, 1997. After the officers announced their presence, Ellison reached inside the door of the dark apartment and, without looking, tossed the flash-bang near the front wall and a few feet from the door.[4] As it turned out, Boyd was sleeping on the floor, near the front wall where the flash-bang

---

3. Neither of the two firearms recovered from Dalebout and Knudsen matched the description of the .357 magnum that was taken from the jewelry store.

4. There is a factual dispute as to whether Ellison placed or tossed the flash-bang inside the apartment. A reasonable jury could find

that the device was tossed, as Boyd suggests, because it detonated in a position that was possibly outside of Ellison's reach. Regardless of whether it was tossed or placed, however, it is clear that the device detonated near the apartment's front wall.

came to rest. Consequently, Boyd suffered burns on her forearm when the device ignited. Moments later, the SWAT Team entered and secured the apartment, followed by the CPD officers who conducted the search. After the officers secured the apartment, Boyd was treated for her injury and later transported to a local hospital.

Boyd's complaint alleges that the use of the flash-bang device constituted excessive force in violation of the Fourth Amendment. The district court granted Defendants' motions for summary judgment on the basis of qualified immunity. The district court found that a Fourth Amendment violation could be present on these facts, but that the law governing the officers' conduct was not clearly established at the time of the incident. The district court granted summary judgment on behalf of the City as to the *Monell* claim because Boyd had failed to produce evidence supporting the claim and had not responded to the City's arguments in opposition.

## II.

### STANDARD OF REVIEW

■ A district court's decision to grant summary judgment on the ground of qualified immunity is reviewed de novo, as grants of summary judgment ordinarily are. *See Martinez v. Stanford*, 323 F.3d 1178, 1183 (9th Cir.2003); *United States v. City of Tacoma*, 332 F.3d 574, 578 (9th Cir.2003). Whether a plaintiff's federal rights were clearly established at the time of the alleged violation is also a question of law reviewed de novo. *Martinez*, 323 F.3d at 1183.

## III.

### DISCUSSION

A. Qualified Immunity

■ The Supreme Court has established a two-part analysis for determining whether qualified immunity is appropriate in a suit against an officer for an alleged violation of a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Under *Saucier*, courts "must examine first whether the [officers] violated [the plaintiff's] constitutional rights on the facts alleged and, second, if there was a violation, whether constitutional rights were clearly established." *Desyllas v. Bernstine*, 351 F.3d 934, 939 (9th Cir.2003) (citing *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151). As to the second inquiry, the Supreme Court has held that "[i]f the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Saucier*, 533 U.S. at 202, 121 S.Ct. 2151.

1. Did Boyd Establish a Constitutional Violation?

■ Defendants cross-appeal the district court's finding that summary judgment was not appropriate on the first part of the *Saucier* analysis. Specifically, Defendants argue that the deployment of the flash-bang under these circumstances did not violate Boyd's Fourth Amendment rights and, if it did, only Ellison can be liable for that violation.

■ We conclude that for purposes of summary judgment, the district court correctly found a constitutional violation based on the facts Boyd presented. "Under the Fourth Amendment, officers may only use such force as is 'objectively reasonable' under the circumstances." *Jackson v. City of Bremerton*, 268 F.3d 646, 651 (9th Cir.2001) (citing *Graham v. Connor*, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). Determining whether a particular use of force is reasonable requires a fact-finder to balance "the na-

ture and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham,* 490 U.S. at 396, 109 S.Ct. 1865 (internal quotation marks omitted). This balance must be "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* The need for such balancing means that "summary judgment ... in excessive force cases should be granted sparingly." *Santos v. Gates,* 287 F.3d 846, 853 (9th Cir. 2002).

Here, viewing the facts in the light most favorable to Boyd, the officers' use of force was constitutionally excessive. The officers had information leading them to believe that up to eight people could be sleeping within the apartment. Without considering alternatives such as a controlled evacuation followed by a search, the officers (according to Boyd) deployed the explosive flash-bang device-which the officers knew had the potential to cause injury-in the room without looking or warning the occupants. The officers had reason to believe that the Hispanic suspect and a gun could be in the apartment, and that there was a loft on the premises.

But this cannot have reasonably caused the officers to believe that it was appropriate to toss, without either looking or sounding a warning, an explosive, incendiary weapon into an apartment where it was believed that there were up to eight people, most of whom were unconnected to the robbery and many of whom were likely asleep. *Cf. United States v. Jones,* 214 F.3d 836, 837–38 (7th Cir.2000) ("police cannot automatically throw bombs into drug dealers' houses, even if the bomb goes by the euphemism 'flash bang device' "). We have previously emphasized our concern with the unconstrained use of similar less-than-lethal devices in situa-

tions where no warning is given. *See Deorle v. Rutherford,* 272 F.3d 1272, 1285 (9th Cir.2001) (discussing "cloth-cased round") ("[l]ess than deadly force that may lead to serious injury may be used only when a strong governmental interest warrants its use, and in such circumstances should be preceded by a warning, if feasible"); *cf. Headwaters Forest Defense v. County of Humboldt,* 240 F.3d 1185, 1200–1201 (9th Cir.2001) (discussing use of pepper spray).

There are likely circumstances in which a risk to officers' safety would make the use of a flash-bang device appropriate. And we recognize that less-than-lethal alternatives are intended to avoid unnecessary fatalities. Nonetheless, given the inherently dangerous nature of the flash-bang device, it cannot be a reasonable use of force under the Fourth Amendment to throw it "blind" into a room occupied by innocent bystanders absent a strong governmental interest, careful consideration of alternatives and appropriate measures to reduce the risk of injury. Given the facts Boyd has presented, the use of the flash-bang here did not meet these requirements, and thus she has established a Fourth Amendment violation sufficient to overcome summary judgment under the first prong of *Saucier.*

■ Defendants also offer two other arguments against a finding of excessive force. First, the County defendants argue that Boyd's excessive force claim must fail because she was never "seized" within the meaning of the Fourth Amendment. This argument is irrelevant, because, as the district court found, Boyd's complaint concerns the use of excessive force in the context of a search, not a seizure. Moreover, the County defendants' argument that the Fourth Amendment does not prohibit the use of excessive force during a search, in the absence of a seizure, has no

merit. This Circuit has clearly recognized that the use of excessive force during a search makes that search unreasonable under the Fourth Amendment. *See Chuman v. Wright,* 76 F.3d 292, 293 (9th Cir.1996) (excessive force claim recognized where officers stormed residence and caused unnecessary property damage during search). Thus, regardless of whether Boyd was seized, she had a Fourth Amendment right to be free from excessive force during the execution of the search warrant.

■ Defendants also argue that even if a Fourth Amendment violation occurred, only Ellison (the individual who deployed the flash-bang) can be liable for that violation. Defendants rely primarily on *Chuman,* where this Court rejected a "team effort" theory of section 1983 liability. *See Chuman,* 76 F.3d at 294. In that case, the district court gave the following jury instruction: "Concerning the search of the residence, if you find the searches were conducted in an unreasonable manner, then no matter whose actions ultimately inflicted the plaintiff's injury, when the deprivation of the rights is the result of a 'team effort,' all members of the 'team' may be held liable." *Id.* We concluded this instruction was improper because it allowed liability to attach to "a mere bystander" who had "no role in the unlawful conduct." *Id.* at 294–95. Following the Fifth Circuit's analysis in *Melear v. Spears,* 862 F.2d 1177 (5th Cir.1989), we required "integral participation" by each officer as a predicate to liability. *See Chuman,* 76 F.3d at 294.

■ Defendants improperly construe *Chuman* as precluding liability under the circumstances of this case. Specifically, "integral participation" does not require that each officer's actions themselves rise to the level of a constitutional violation. For example, in *James ex rel. James v.*

*Sadler,* 909 F.2d 834 (5th Cir.1990), cited with approval by *Chuman,* the court held that officers who provided armed backup during an unconstitutional search were "integral" to that search, and were therefore participants rather than mere bystanders. *Id.* at 837. Additionally, in *Melear* itself, the Fifth Circuit held that an officer who does not enter an apartment, but stands at the door, armed with his gun, while other officers conduct the search, can nevertheless be a "full, active participant" in the search. *See Melear,* 862 F.2d at 1186.

The facts of this case clearly support a finding that each officer involved in the search operation was an "integral participant." First, as in *James* and *Melear,* the officers in this case stood armed behind Ellison while he reached into the doorway and deployed the flash-bang. Second, the use of the flash-bang was part of the search operation in which every officer participated in some meaningful way. Third, every officer was aware of the decision to use the flash-bang, did not object to it, and participated in the search operation knowing the flash-bang was to be deployed. Therefore, under the integral participation analysis adopted in *Chuman,* each defendant may be held liable for the Fourth Amendment violation outlined above. *See* 76 F.3d at 294. Consequently, we affirm the district court's finding that Defendants were not entitled to qualified immunity under the first part of the *Saucier* analysis.

### 2. Was Boyd's Fourth Amendment Right Clearly Established?

■ The second part of the *Saucier* analysis asks whether the plaintiff's constitutional right was clearly established at the time of the injury. *See Saucier,* 533 U.S. at 202, 121 S.Ct. 2151. "For a constitutional right to be clearly established, its contours 'must be sufficiently clear that a

reasonable official would understand that what he is doing violates that right.' " *Hope v. Pelzer*, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). In other words, an officer who makes a reasonable mistake as to what the law requires under a given set of circumstances is entitled to the immunity defense. *Saucier*, 533 U.S. at 205, 121 S.Ct. 2151.

■■■■■■ However, a victim's constitutional rights may be clearly established in the absence of a case "on all fours prohibiting [the] particular manifestation of unconstitutional conduct [at issue]." *Deorle*, 272 F.3d at 1286. In particular, qualified immunity is not appropriate merely because no cases directly address the use of a new weapon or "a novel method is used to inflict injury." *Id.* Rather, when an officer's conduct "is so patently violative of the constitutional right that reasonable officials would know without guidance from the courts that the action was unconstitutional, closely analogous pre-existing case law is not required to show that the law is clearly established." *Id.* (internal quotation marks omitted). In excessive force cases, the inquiry remains whether, "under the circumstances, a reasonable officer would have had fair notice that the force employed was unlawful, and [whether] any mistake to the contrary would have been unreasonable." *Drummond v. City of Anaheim*, 343 F.3d 1052, 1060 (9th Cir.2003).

■■■■ The Supreme Court has provided little guidance as to where courts should look to determine whether a particular right was clearly established at the time of the injury. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 n. 32, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (declining to define "the circumstances under which' the state of the law' should be 'evaluated by reference to the opinions of this Court, of the Courts of Appeals, or of the local District Court' ") (quoting *Procunier v. Navarette*, 434 U.S. 555, 565, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978)). In the Ninth Circuit, we begin our inquiry by looking to binding precedent. *See Capoeman v. Reed*, 754 F.2d 1512, 1514 (9th Cir.1985). If the right is clearly established by decisional authority of the Supreme Court or this Circuit, our inquiry should come to an end. On the other hand, when "there are relatively few cases on point, and none of them are binding," we may inquire whether the Ninth Circuit or Supreme Court, at the time the out-of-circuit opinions were rendered, would have reached the same results. *See id.* at 1515. Thus, in the absence of binding precedent, we " 'look to whatever decisional law is available to ascertain whether the law is clearly established' for qualified immunity purposes, 'including decisions of state courts, other circuits, and district courts.' " *Drummond*, 343 F.3d at 1060 (quoting *Malik v. Brown*, 71 F.3d 724, 727 (9th Cir.1995)).

In October 1997, neither the Supreme Court nor this Circuit had provided any guidance as to when the use of flash-bangs constitutes a Fourth Amendment violation. Thus, we must ask whether, despite the absence of binding precedent, there was sufficient non-binding authority to place the officers on notice that using a flash-bang in these circumstances would be excessive. By October 1997, two circuit courts and one state court had addressed the use of flash-bangs within the context of the Fourth Amendment. We examine each of these cases to determine whether Boyd's Fourth Amendment right was clearly established at the time of the injury.

In *United States v. Baker*, 16 F.3d 854 (8th Cir.1994), police officers were executing a search warrant on a known "crack house." Without knocking or announcing

their presence, the officers "lobbed one distraction stun device through the kitchen window and rolled another through the front door." *Id.* at 855. Before entering the house, the police had information that the front door had been barricaded and that two Doberman Pinschers were inside. Presented with the question of whether the use of the distraction device was unreasonably executed so as to warrant suppression of the fruits of the search, the Eighth Circuit upheld the district court's finding that "the police reasonably believed the use of distraction devices was needed to effect a safe entry." *Id.* at 856.

Next, the Supreme Judicial Court of Massachusetts was presented with the issue in *Commonwealth v. Garner,* 423 Mass. 735, 672 N.E.2d 510 (1996). In *Garner,* police officers had obtained a warrant to search an armed robbery suspect's apartment. The officers had information that the inhabitants of the apartment might be armed and that two children and a pregnant woman could also be inside the apartment. Under these circumstances, the officers broke a bedroom window, dropped a flash-bang device into the bedroom without looking, and proceeded to storm the apartment. As it turned out, a four-year-old child was sleeping in the bedroom where the flash-bang was deployed and, as a result, suffered from shock and smoke inhalation when the device ignited.

On these facts, the court in *Garner* found that there had been no use of force so excessive that it warranted suppression of the evidence found in the search. The court reasoned that the factors that might militate against the use of a flash-bang in this case were "swamped by the very strong grounds the police had for believing the occupants of [the apartment] were armed and vicious." *Id.* at 515. Thus, the court concluded that "the use of the device within the apartment cannot be described

as an unreasonable part of a plan designed to get the operation over with as quickly as possible and to minimize the possibility of a gun battle." *Id.* at 516.

Finally, the Tenth Circuit addressed the issue of whether the use of a flash-bang amounted to excessive force in an opinion that was published approximately eight months prior to the incident in this case. In *United States v. Myers,* 106 F.3d 936 (10th Cir.1997), police obtained a warrant to search a residence that was suspected of housing a marijuana growing operation. A background check revealed that Mr. Myers, one of the occupants of the home, had prior convictions for burglary, theft, and cocaine trafficking. Additionally, Mr. Myers had been involved with a fire bombing and possession of a firearm while he was a juvenile. When the officers effectuated the search, they announced their presence, battered down the door, and rolled a flash-bang into the living room of the house. Mr. Myers, his wife, nineteen-year-old stepson, nine-year-old stepdaughter, and seventeen-month-old daughter were inside the residence.

In determining whether the officers' use of the flash-bang was sufficiently unreasonable to warrant suppression of the evidence, the Tenth Circuit reasoned as follows:

> The use of a "flashbang" device in a house where innocent and unsuspecting children sleep gives us great pause. Certainly, we could not countenance the use of such a device as a routine matter. However, we also recognize that we must review the agents' actions from the perspective of reasonable agents on the scene who are legitimately concerned with not only doing their job but with their own safety.

*Id.* at 940 (internal citations omitted). The *Myers* court went on to hold that "[a]lthough it might seem that the

[agents'] actions in this case come dangerously close to a Fourth Amendment violation, we cannot say that their actions were objectively unreasonable given [the circumstances]." *Id.* The circumstances that the Tenth Circuit relied on were Mr. Myers' history of drug trafficking and fire bombing and the suspected marijuana growing operation inside the home. *Id.*

Taken together, *Baker, Garner,* and *Myers,* in October 1997, failed to provide the officers in this case with the requisite level of guidance to put them on notice that using the flash-bang in these circumstances violated Boyd's Fourth Amendment rights. In fact, *Baker, Garner,* and *Myers* all hold that the use of flash-bang devices was reasonable under their respective facts. To be sure, *Baker* and *Myers* are distinguishable since there is no indication that the officers in those two cases knew that innocent people were present when the flash-bangs were used. Nonetheless, we cannot extract from *Baker* or *Myers* a rule so strong as to put the defendants in this case on clear notice that their actions would amount to excessive force. Additionally, the officers in *Garner* knew that a pregnant woman and small children were likely to be inside the residence when the flash-bang was deployed, yet the court found no Fourth Amendment violation. In sum, we conclude that without any guidance from this Circuit and an absence of non-binding authority that otherwise clearly establishes the right, the officers here were not put on sufficient notice that using a flash-bang in these circumstances was unconstitutional.

Notwithstanding the lack of judicial guidance at the time of the injury, Boyd argues that no reasonable officer could have been mistaken as to the use of force authorized by the Fourth Amendment in this case. Essentially, Boyd argues the conduct at issue here was "so patently violative of the constitutional right" that reasonable officers should have known that their actions were unconstitutional without guidance from the courts. *Deorle,* 272 F.3d at 1286. While such a conclusion would likely be appropriate if the police officers could not have reasonably believed that the robbery suspects would be in the apartment at the time of the search, or that there was no reasonable likelihood that the occupants of the apartment would be armed, this was not the case here.

Although Boyd argues that the officers could not have believed that any robbery suspect might have been in the apartment prior to the search, the record does not support this argument. Boyd notes that witnesses to the robbery indicated that only two individuals were involved, and that police had already arrested two individuals: Dalebout and Knudsen. By deduction, Boyd argues, there could be no other suspects at large at the time of the search. As defendants correctly point out, however, neither Dalebout nor Knudsen fit the description of the Hispanic suspect, whom police legitimately believed to be at large. Additionally, witnesses recalled that it was the Hispanic suspect who used the firearm during the robbery.

Other undisputed facts indicate that the officers' decision to use the flash-bang in these circumstances was not "so patently violative of the constitutional right" that they should have known what they were doing was unconstitutional without judicial guidance. *Deorle,* 272 F.3d at 1286. First and foremost, Dalebout and Knudsen had recently left the apartment with firearms, drugs and jewelry in their possession and thereafter attempted to evade law enforcement in a high-speed chase. Second, the Hispanic suspect, believed to have frequented the apartment, and the .357 magnum were still unaccounted for. Additionally, the officers had information

that another individual connected with the apartment had tried to purchase an assault rifle. Third, the apartment had a loft that made the officers particularly vulnerable as they entered the apartment. Fourth, there was a prior report of an assault involving the primary resident of the apartment and the apartment was known to be a location of drug activity.

We conclude that in October 1997 a reasonable officer faced with these facts, and without guidance from the courts, was not on notice that the use of a flash-bang was unconstitutional. Thus, while we now hold that the officers in the specific circumstances of this case violated Boyd's Fourth Amendment rights in using a flash-bang inside a dark apartment where five to eight people might be sleeping, that error was not so egregious as to have been an unreasonable application of the law that existed at the time of the incident. Consequently, the officers are entitled to qualified immunity because Boyd's Fourth Amendment right to be free from dangerous flash-bang devices under these circumstances was not clearly established.

B. The *Monell* Claim Against the City

According to the Supreme Court, a municipality may only be sued under section 1983 if "the action that is alleged to be unconstitutional implement[ed] or execute[d] a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers," *Monell*, 436 U.S. at 690, 98 S.Ct. 2018 or "the city made a 'deliberate' or 'conscious' choice to fail to train its employees adequately," *Mackinney v. Nielsen*, 69 F.3d 1002, 1010 (9th Cir.1995). Boyd appeals the district court's finding that her section 1983 claim against the City failed as a matter of law. The district court found that Boyd had failed to respond to the City's arguments in support of its motion for summary judgment and had pointed to no evidence tending to establish a genuine issue of material fact on the *Monell* claim.

Boyd argues that municipal liability is proper because the City maintained a "lack of official policy [and a] custom or practice of delegating the decision to employ [flash-bangs] to police officers without any controls." Essentially, Boyd contends that the City made a " 'deliberate' or 'conscious' choice to fail to train its employees adequately." *Mackinney*, 69 F.3d at 1010. However, Boyd cannot survive summary judgment on her *Monell* claim by simply relying on the lack of a written policy. Defendants presented evidence that Sergeant Skinner, who made the decision to use the flash-bang, and Deputy Ellison, who deployed the device, were both trained on the use of flash-bangs. Moreover, contrary to Boyd's assertion that there was a lack of control over the decision to use the flash-bang, undisputed evidence shows that Sergeant Skinner, the SWAT Team supervisor, had the ultimate authority to make the decision to deploy the flash-bang device. There is simply no evidence suggesting that the City deliberately failed to train or control its officers as to when and how to deploy flash-bang devices. Therefore, Boyd is unable to demonstrate the existence of any genuine issue as to the City's liability under *Monell*, and summary judgment was appropriate.

**AFFIRMED.**