**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| STEPHEN SJURSET, personally and as next friend for N.S. and T.B., *Plaintiff-Appellee*, <br><br> v. <br><br> CHARLES BUTTON, Stayton City Police Department, in his individual and official capacity; MICHAEL MEEKS, Stayton City Police Department, in his individual and official capacity; SCOTT MUMEY, Stayton City Police Department, in his individual and official capacity, *Defendants-Appellants*, <br><br> and <br><br> MARY ANNE MILLER, in her individual capacity; DYAN BRADLEY, in her individual capacity; CITY OF STAYTON, a municipal entity, *Defendants*. | No. 13-35851 <br><br> D.C. No. 6:12-cv-00282-AA <br><br><br> OPINION |

Appeal from the United States District Court
for the District of Oregon
Ann L. Aiken, Chief District Judge, Presiding

Argued and Submitted
October 14, 2015—Portland, Oregon

Filed December 4, 2015

Before: Ferdinand F. Fernandez, Ronald Lee Gilman,[*]
and Carlos T. Bea, Circuit Judges.

Opinion by Judge Gilman

---

## SUMMARY[**]

### Civil Rights

The panel reversed the district court's order on summary judgment denying qualified immunity to police officers, and remanded in an action brought pursuant to 42 U.S.C. § 1983 in which plaintiff alleged that the officers took custody of his children without reasonable cause or a court order, in violation of plaintiff's Fourteenth Amendment right to familial association and the children's Fourth Amendment right to be free from unreasonable seizure.

The panel first rejected plaintiff's contention that pursuant to *Johnson v. Jones*, 515 U.S. 304 (1995), disputed factual issues precluded it from hearing the officers' appeal from the

---

[*] The Honorable Ronald Lee Gilman, Senior Circuit Judge for the U.S. Court of Appeals for the Sixth Circuit, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

district court's order.  The panel held that *Johnson* was inapplicable because this appeal was based on undisputed facts as they related to a purely abstract issue of law—that is, whether the officers violated clearly established law when they acted in reliance on the determination made by Department of Human Services officials that the children were in imminent danger.

The panel held that the officers were not incompetent in believing that they were legally authorized to act in reliance on the Department of Human Services' determination that the children were in imminent danger.  The panel further held that even if the officers were mistaken in their belief that they could remove the children at the direction of the Department of Human Services without court authorization, their actions were objectively reasonable under the circumstances. Accordingly, the panel held that the officers were entitled to qualified immunity and remanded the case to the district court for entry of judgment in their favor.

## COUNSEL

Edward S. McGlone III, Lake Oswego, Oregon, for Defendants-Appellants.

Mikel Ross Miller, Bend, Oregon, for Plaintiff-Appellee.

## OPINION

GILMAN, Senior Circuit Judge:

In February 2010, three police officers from the Stayton City Police Department (the Stayton officers), acting at the direction of officials from the Oregon Department of Human Services (DHS), entered the home of Stephen Sjurset and assisted in removing his two young children from the residence without a court order. Sjurset subsequently filed an action on behalf of himself and his children against the Stayton officers, four DHS officials, and the City of Stayton pursuant to 42 U.S.C. § 1983. He alleged that DHS and the Stayton officers took custody of his children without reasonable cause to believe that the children were in imminent danger of serious bodily injury, thus violating his Fourteenth Amendment right to familial association and the children's Fourth Amendment right to be free from unreasonable seizure.

At the summary-judgment stage of the case, the district court dismissed Sjurset's claims against the City of Stayton and the two DHS officials who were not involved in the decision to remove the children. It rejected claims by the Stayton officers and the two remaining DHS officials that they were entitled to qualified immunity. Only the Stayton officers appeal. For the reasons set forth below, we **REVERSE** the decision of the district court with regard to the Stayton officers and **REMAND** the case to the district court for entry of judgment in their favor.

# I.  BACKGROUND

## A.  Factual background

On February 18, 2010, officials at DHS received a phone call from a medical doctor's office reporting that Jessica Borchers—the significant other of Stephen Sjurset—had tested positive that day for methamphetamine, amphetamines, and marijuana.  Borchers, who was pregnant at the time, lived in Stayton, Oregon with Sjurset and her two- and five-year-old children, N.S. and T.B.  Sjurset is N.S.'s father and T.B.'s legal guardian.

The incident was not the first of its kind.  In 2007, Borchers also tested positive for using methamphetamine while pregnant with her second child, N.S.  As a result of that prior incident, both Borchers and Sjurset were convicted of endangering the welfare of a minor under Or. Rev. Stat. § 163.575.  T.B. was placed in temporary foster care until Borchers successfully completed a drug-treatment program.

Acting on the newly registered complaint, DHS immediately initiated an investigation.  DHS case worker Caryn Moller-Mata attempted to meet with Borchers and Sjurset to verify the health and safety of the two children. She first contacted Borchers on Friday, February 19, 2010. Borchers said that she was out of town and that Sjurset was taking care of the children.  Moller-Mata then made several attempts to contact Sjurset, but received no response.  At the end of the day, when she was unable to locate or meet with either parent, Moller-Mata called the Stayton City Police Department and requested that it dispatch officers to Sjurset's house over the weekend to conduct an in-person welfare check on N.S. and T.B.

At approximately 9:00 p.m. on Saturday, February 20, officers Button, Meeks, and Mumey arrived outside Sjurset's house. Officer Button requested to speak with Borchers and to see the children, but Sjurset refused to let the officers inside the house without a warrant. When Borchers appeared at the door, however, she said that the officers could view the children through the front window.

Unsure of what to do next, the Stayton officers contacted DHS for further guidance. DHS dispatched an on-duty social worker, Mary Anne Miller, to the scene. On the way to Sjurset's house, Miller phoned Moller-Mata and the two discussed Sjurset's and Borchers's prior child-endangerment convictions and their refusals to cooperate with the ongoing DHS investigation. Importantly, because these events transpired on a Saturday evening, DHS officials could not obtain a court order authorizing the children's removal until the following Monday morning, which was at least 36 hours away. Miller then contacted her supervisor, Dyan Bradley, to evaluate the situation. They discussed Borchers's recent positive drug test, Sjurset's and Borchers's refusal to cooperate, their prior convictions, and the risk of leaving the children in the care of the couple for another 36 hours. In light of these concerns, Miller and Bradley made an on-the-spot decision to take the children into protective custody without a court order.

All the parties are in agreement that the Stayton officers did not participate in the decision by Miller and Bradley to take protective custody of the children. The parties further agree that Miller and Bradley made the protective-custody determination prior to the Stayton officers' entry into the house. Finally, the record indicates that the Stayton officers did not make their own independent judgments as to whether

there was probable cause to enter the home and remove the children without a warrant.

In accordance with DHS's determination, the Stayton officers entered the house alongside Miller and removed N.S. and T.B. The district court's opinion notes that DHS "concede[d] that there was no visual evidence of drug use in the area of the house that the officials occupied while the children were removed." No other part of the house was searched. N.S. and T.B. were placed into temporary foster care and, following a "shelter hearing" two days later, DHS obtained custody.

## B. Procedural background

Sjurset brought an action on behalf of himself and his children against the City of Stayton, the DHS officials, and the Stayton officers under 42 U.S.C. § 1983, alleging that the parties had (1) violated his Fourteenth Amendment right to familial association and (2) violated the children's Fourth Amendment right to be free from unreasonable seizure by removing the children in the absence of a court order or evidence of imminent danger of serious bodily harm. He also alleged that DHS officials Moller-Mata and Maria Randall had presented false information at the shelter hearing, in violation of his substantive- and procedural-due-process rights. *Id.*

All the defendants moved for summary judgment on Sjurset's § 1983 claims, arguing that their actions did not violate Sjurset's or his children's constitutional rights. The district court granted summary judgment in favor of both the City of Stayton and the two DHS officials who testified at the shelter hearing. But it denied qualified immunity to Miller,

Bradley, and the Stayton officers.  Relevant to this appeal, the court rejected the Stayton officers' argument for the following reasons:

> Once the Stayton Defendants entered the home, they apparently saw no physical evidence suggesting that the children were in imminent danger.  Further, no defendant suggests that Borchers was in any way under the influence of substances, or that there was evidence of the existence of drug paraphernalia.  Although the Stayton Defendants argue that they did not take action until Miller arrived on the scene and announced she had taken custody of the children, the Court is not convinced that reliance on Miller was reasonable as a matter of law, give [sic] the apparent absence of exigent circumstances or visible signs of imminent danger to NS and TB.  Thus, plaintiffs have successfully raised a question of fact as to whether the Stayton Defendants violated [the plaintiffs'] clearly established rights by removing the children from the home, and summary judgment in favor of the officers is therefore inappropriate.

The Stayton officers timely filed this appeal.  They argue that the district court erred in denying them qualified immunity because (1) the officers violated no clearly established right of the plaintiffs when they carried out DHS's instructions to enter the home and remove the children; (2) police officers are entitled to act in good faith on the instructions of other law-enforcement officers, including

child-welfare officials, even if the basis for those instructions is mistaken or erroneous; and (3) the Stayton officers were not incompetent in believing that they were legally authorized to act in reliance on DHS's determination.

## II. ANALYSIS

### A. Standard of review

"A grant of summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Albino v. Baca*, 747 F.3d 1162, 1168 (9th Cir. 2014) (en banc) (quoting Fed. R. Civ. P. 56(a)), *cert. denied sub nom. Scott v. Albino*, 135 S. Ct. 403 (2014). In applying this standard, we "view[] the evidence in the light most favorable to the nonmoving party." *Burke v. Cnty. of Alameda*, 586 F.3d 725, 730 (9th Cir. 2009). "A district court's decision denying summary judgment on the ground of qualified immunity is reviewed *de novo*." *Hopkins v. Bonvicino*, 573 F.3d 752, 762 (9th Cir. 2009). We thus review the evidence presented in the light most favorable to Sjurset, the nonmoving party, to determine whether the district court erred in denying qualified immunity to the Stayton officers.

### B. The law of qualified immunity

Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mueller v. Auker* (*Mueller II*), 700 F.3d 1180, 1185 (9th Cir. 2012) (quoting *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1244–45 (2012)) (internal quotation marks omitted). The

doctrine "gives government officials breathing room to make reasonable but mistaken judgments" and "protects 'all but the plainly incompetent or those who knowingly violate the law.'"  *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2085 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  It "makes allowance for some constitutional mistakes," *Mueller II*, 700 F.3d at 1185–86, such as "when an officer reasonably believes that his or her conduct complies with the law," *Pearson v. Callahan*, 555 U.S. 223, 244 (2009).

A qualified-immunity analysis requires us to ascertain (1) whether, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right," and (2) "whether the law clearly established that the officer's conduct was unlawful in the circumstances of the case." *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part by Pearson*, 555 U.S. 223 (holding that *Saucier*'s two-step sequence is not mandatory).

In *Pearson*, the Supreme Court warned against beginning with the first prong of the qualified-immunity analysis when it would unnecessarily wade into "difficult questions" of constitutional interpretation that "have no effect on the outcome of the case."  555 U.S. at 236–37; *see also al-Kidd*, 131 S. Ct. at 2080.  The Court further emphasized that lower courts have discretion to decide which of the two prongs to "address[] first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.  "When qualified immunity is asserted at the pleading stage," for example, "the answer to whether there was a violation may depend on a kaleidoscope of facts not yet fully developed." *Id.* at 238–39 (brackets and internal quotation marks omitted).

We therefore have discretion to apply the second prong of the *Saucier* test at the outset in order to determine whether the law governing the Stayton officers' conduct was clearly established. If indeed the Stayton officers did not violate clearly established law, then we can determine that qualified immunity is appropriate and may thus dispose of the case without undertaking an analysis of whether a constitutional violation occurred in the first instance.

In sum, we will heed the Supreme Court's admonition against prematurely attempting to define the particular constitutional violation in question in this case. This is especially appropriate here because the district court has already determined that "a number of factual issues . . . remain unresolved" regarding the circumstances under which the DHS officials made their protective-custody decision. Recognizing the "general rule of constitutional avoidance," *id.* at 241, we now turn to the second prong of the *Saucier* test.

In determining whether a government official's conduct violates clearly established law, the test is whether, "at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right. We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Al-Kidd*, 131 S. Ct. at 2083 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (brackets, citation, and internal quotation marks omitted). The Supreme Court has "repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality." *Id.* at 2084 (citation omitted). "The inquiry . . . must be undertaken in the light of the specific

context of the case, not as a broad general proposition." *Mueller II*, 700 F.3d at 1185 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)) (internal quotation marks omitted).

Nor does our analysis end there. "[E]ven if the violated right was clearly established, [the Supreme Court] recognized that it may be difficult for a police officer fully to appreciate how the legal constraints apply to the specific situation he or she faces. Under such a circumstance, if the officer's mistake as to what the law requires is reasonable, . . . the officer is entitled to the immunity defense." *Blankenhorn v. City of Orange*, 485 F.3d 463, 471 (9th Cir. 2007) (alteration in original) (quoting *Motley v. Parks*, 432 F.3d 1072, 1077 (9th Cir. 2005) (en banc), *overruled in part on other grounds by United States v. King*, 687 F.3d 1189 (9th Cir. 2012) (en banc)) (brackets and internal quotation marks omitted).

## C. Factual issues do not preclude us from hearing the Stayton officers' appeal

In denying summary judgment for the Stayton officers, the district court concluded that there was sufficient evidence to create a genuine dispute as to whether reasonable officers could have believed that Sjurset's children were in imminent danger of serious bodily injury at the time of removal. Given this conclusion, Sjurset contends that we should refrain from deciding the reasonableness of the Stayton officers' belief that the children were in such imminent danger that their removal was justified. He cites in support the case of *Johnson v. Jones*, 515 U.S. 304 (1995), in which the Supreme Court held that "a defendant, entitled to invoke a qualified immunity defense, may not appeal a district court's summary judgment order insofar as that order determines whether or

not the pretrial record sets forth a 'genuine' issue of fact for trial." *Id.* at 319–20.

As we held in *Ram v. Rubin*,

> we reiterate that we do not have jurisdiction to determine the factual issue whether a reasonable officer could have believed that, based on the information known to [the officer], seizing Ram's children was lawful. The district court denied [the officer] summary judgment because the pretrial record indicated that genuine issues of material fact existed. This ends our inquiry with regard to [the officer's] appeal.

118 F.3d 1306, 1311 (9th Cir. 1997).

Sjurset thus makes a compelling argument that would preclude our ability to consider the factual issues regarding whether seizing Sjurset's children was lawful. As applied to the appeal before us, however, Sjurset's argument is without merit. To start with, the Supreme Court cabined the holding of *Johnson* in a subsequent case. It clarified that even if issues remain regarding the sufficiency of the evidence, "summary judgment determinations *are* appealable when they resolve a dispute concerning an abstract issue of law relating to qualified immunity," such as "whether the federal right allegedly infringed was clearly established." *Behrens v. Pelletier*, 516 U.S. 299, 313 (1996) (quoting *Johnson*, 515 U.S. at 317) (brackets and internal quotation marks omitted).

We have held that the *Behrens* rule applies in cases "where the appeal focuses on whether the defendants violated a clearly established law given the undisputed facts." *Knox v. Sw. Airlines*, 124 F.3d 1103, 1107 (9th Cir. 1997). This is particularly important in the qualified-immunity context because "[i]mmunity ordinarily should be decided by the court long before trial." *Hunter v. Bryant*, 502 U.S. 224, 228 (1991).

Sjurset correctly points out that *Johnson* would preclude us from determining the reasonableness of *the DHS officials'* actions based on the facts that remain in dispute. But *Johnson* is inapplicable here because this appeal is based on undisputed facts as they relate to a purely "abstract issue of law"—that is, whether *the Stayton officers* violated clearly established law when they acted in reliance on the DHS officials' determination. The district court explicitly acknowledged that the facts concerning the Stayton officers' actions are not in dispute.

What the district court did find in dispute—namely, the number of calls that Moller-Mata made to Sjurset and Borchers on the day before the welfare check, the nature of Borchers's drug abuse, and whether viewing the children through a window could reasonably give rise to a showing of imminent danger—do not form the basis of the Stayton officers' appeal. These disputed facts might well apply to the reasonableness of the DHS officials' protective-custody determination, but they do not apply to whether the Stayton officers violated clearly established rights of the plaintiffs by relying on the DHS officials' protective-custody determination.

In addition, the district court noted that the parties all agreed that DHS, and not the Stayton officers, made the decision to take protective custody of the children. There is no dispute that the Stayton officers entered Sjurset's residence and assisted in the children's removal in reliance on that decision. Finally, no one disputes that, under Oregon law, DHS has the statutory authority to take protective custody "[w]hen [a] child's condition or surroundings reasonably appear to be such as to jeopardize the child's welfare." Or. Rev. Stat. § 419B.150(1)(a). These undisputed facts provide a sufficient basis to determine whether the Stayton officers' reliance on DHS's determination violated any clearly established right of the plaintiffs. An analysis based on these facts is therefore appropriate. *See Knox*, 124 F.3d at 1106–07.

## D.  The Stayton officers did not violate clearly established law

Under the framework set forth above, we now focus on whether, on February 20, 2010, the law clearly established that the Stayton officers could not act pursuant to DHS's protective-custody determination in entering Sjurset's house and removing the children without a court order. Sjurset contends that his Fourteenth Amendment right to familial association is clearly established, pointing to our holding in *Wallis v. Spencer* that

> [o]fficials may remove a child from the custody of its parent without prior judicial authorization only if the information they possess at the time of the seizure is such as provides reasonable cause to believe that the child is in imminent danger of serious bodily

injury and that the scope of the intrusion is
reasonably necessary to avert that specific
injury.

202 F.3d 1126, 1138 (9th Cir. 1999).

Furthermore, as to the Fourth Amendment claim, Sjurset
argues that the Stayton officers should have known that
clearly established law permits a warrantless entry into a
home only if an exception to the warrant requirement applies,
such as emergency, exigency, or consent. *See Espinosa v.
City & Cnty. of San Francisco*, 598 F.3d 528, 533 (9th Cir.
2010). Sjurset contends that, under the facts alleged, the
DHS officials could not have reasonably concluded that the
children were in imminent danger during the 36 hours that
would have passed before the courts reopened Monday
morning. By extension, he argues, the Stayton officers'
actions based on this determination violated his and his
children's constitutional rights.

Sjurset points to our decision in *Wallis* to argue that
clearly established law prohibited the officers from removing
the children unless they were in imminent danger. *See*
202 F.3d at 1138. In *Wallis* we denied summary judgment to
the City of Escondido when its police officers entered a
family's house at midnight, interviewed the family's children,
and took custody of the children based on a purported
"pickup order" from the state's child-welfare agency. *Id.* at
1132–34. In actuality, however, "no [protective-custody]
order ever existed and [the child-welfare agency] had not yet
even reached a decision about whether to seek protective
custody of the children." *Id.* at 1133.

The police officers' actions in *Wallis* are therefore readily distinguishable from the case at hand in two important ways. First, *Wallis* involved a factual dispute whether the child-welfare-agency officials had actually issued an order to take protective custody. *Id.* at 1133–35. Second, the police in *Wallis* acted independently without verifying the existence of the purported order. *Id.* They therefore acted not in *reliance on* the child-welfare agency, but instead in the *absence of* the agency's direction.

In the present case, the exact opposite is true—the Stayton officers acted not independently of, but pursuant to, the protective-custody determination by DHS. The Stayton officers traveled to Sjurset's residence to conduct a welfare check at the behest of DHS. When Sjurset denied their entry, the Stayton officers did not take matters into their own hands or make their own independent judgments, as the *Wallis* officers had; instead, they called DHS for additional guidance, and Miller was dispatched to the scene. Thus, unlike the *Wallis* officers, the Stayton officers were careful not to take any action that was not first authorized by DHS. In addition, and unlike in *Wallis*, Miller and Bradley made their protective-custody determination in the midst of the ongoing welfare check, when the Stayton officers were physically present, and the Stayton officers accompanied Miller as she explained to Sjurset and Borchers the rationale for the determination. The authenticity of the determination was therefore readily verifiable.

In light of these obvious distinctions, *Wallis* falls short of clearly establishing that reasonable officers in the Stayton officers' situation would have understood that they had a constitutional responsibility to second-guess DHS's protective-custody determination. Such second-guessing

would have required the officers either to disrupt or to refuse to take part in the entry and removal of Sjurset's children. To be sure, if the Stayton officers had participated in the decision to take protective custody of Sjurset's children, then our precedent in *Wallis* and similar cases would clearly establish that the officers could not do so without a reasonable basis for believing that the children were in imminent danger. *See, e.g.*, *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1108–09 (9th Cir. 2001) (holding that the imminent-danger exception applies to police officers and social workers who make protective-custody decisions). But here the police officers did not participate in such a decision; they instead relied on DHS's determination.

Sjurset further contends that the Stayton officers' role as "integral participants" in the entry and removal is enough to trigger their liability for any violations of Sjurset's constitutional rights. To support this theory, Sjurset relies on *Boyd v. Benton County*, 374 F.3d 773 (9th Cir. 2004). In *Boyd*, we held that officers who provided backup during a search in which one officer threw a lethal "flash-bang" device into a dark room were "integral participant[s]" for the purpose of the plaintiff's excessive-force claim. *Id.* at 780. We noted that the supporting officers did not physically throw the device, but concluded that the plaintiff had nevertheless satisfied the first prong of the *Saucier* test because the officers "stood armed behind" the acting officer, were "aware of the decision to use the flash-bang" device, and "did not object to it." *Id.*

But Sjurset's reliance on *Boyd* is misplaced both factually and legally. As a factual matter, the officers in *Boyd* acted as a collective team and were carrying out a preplanned search operation. *Id.* at 777. Before the search, the officers

"gathered for a briefing" and "discussed various circumstances surrounding the operation." *Id.* Only after this collective discussion did the supervising sergeant make the ultimate decision to use a flash-bang device. *Id.* In contrast, no facts in this case suggest that the Stayton officers were privy to any discussions, briefings, or collective decisions made by DHS in its protective-custody determination.

Moreover, even after the sergeant in *Boyd* made his decision, the officers collectively discussed "the manner of deploying the flash-bang . . . , taking into account the fact that several people might be sleeping in the apartment." *Id. Boyd* thus involved a collective decisionmaking process among the officers, with the result that all of them could be considered "integral participants" in the execution of the plan. *Id.* It does not squarely address the case at hand, wherein an entirely separate agency—DHS—made a protective-custody determination over which the Stayton officers had no input.

And even if we were to assume that the Stayton officers were "integral participants" in the execution of the protective-custody determination, *Boyd* would not help Sjurset's argument. This is because in *Boyd* we ultimately concluded that—despite the existence of a constitutional violation—the officers were entitled to qualified immunity because no clearly established law specifically precluded the use of a flash-bang device in the context of a search. *Id.* at 784 (holding that "a reasonable officer faced with these facts, and without guidance from the courts, was not on notice that the use of a flash-bang was unconstitutional"). *Boyd* thus supports the notion that even officers who are integral participants in an unconstitutional search are immune from liability if the unlawfulness of the conduct is not clearly established.

In sum, neither *Wallis* nor *Boyd* clearly establishes that the Stayton officers violated Sjurset's constitutional rights when they acted in reliance on DHS's protective-custody determination. We must therefore look elsewhere to decide whether the officers were on notice that their conduct violated clearly established law. Neither statute nor precedent, however, squarely addresses the circumstances of this particular case.

First, under the existing regulatory framework, Oregon's child-protection statute gives DHS authority over "investigation and enforcement of child protection services" in the state. Or. Rev. Stat. § 409.185(1). The statute further empowers DHS employees and peace officers alike to take protective custody of a child "[w]hen the child's condition or surroundings reasonably appear to be such as to jeopardize the child's welfare." *Id.* § 419B.150(1)(a). Once a protective-custody determination is made, however, the statute does not address whether assisting officials should conduct their own independent inquiry as to the validity of that determination. Nor does the statute direct officers to refuse to carry out a protective-custody determination in the absence of a court order. *See id.* chs. 409, 419B. Under existing Oregon law, therefore, the Stayton officers were not expected to verify the legality of DHS's decision after it was made.

Second, there is no "robust consensus of cases of persuasive authority" that would put the officers on notice that they could not enter Sjurset's residence and remove the children pursuant to the DHS protective-custody determination, even if that determination was flawed. *See al-Kidd*, 131 S. Ct. at 2084; *see also United States v. Black*, 482 F.3d 1035, 1040 (9th Cir. 2007) (holding that

"conscientious" police officers "[e]rring on the side of caution" in conducting a welfare search without consent are entitled to immunity).

One Ninth Circuit decision in particular would be difficult to distinguish if we were to hold that the Stayton officers' conduct violated clearly established law. In *Mueller v. Auker* (*Mueller I*), a mother sued a police detective for taking custody of her sick infant without a court order, "at the behest of hospital doctors," despite the mother's objections. 576 F.3d 979, 982 (9th Cir. 2009). On a second appeal, we held that the detective's reliance on the doctors' medical judgment was objectively reasonable and thus granted him qualified immunity. We noted that, "[e]ven were we to assume with hindsight that the [medical] assessment was wrong, to attribute such a professional error in judgment to Detective Rogers would be manifestly inappropriate." *Mueller II*, 700 F.3d at 1188. We further held that two police officers acting at the direction of the detective were entitled to qualified immunity, noting that the officers "made no decisions at all." *Id.* at 1189.

In *Mueller II* we noted that the district court observed that "[t]he phrase 'imminent danger' has not been given any detailed definition, either by *Wallis* . . . or any other case, that could have guided" the detective. *Id.* at 1188. We must therefore be cautious not to "repeat the analytical mistake we made in *Brosseau*, where we approached this issue [of clearly established law] based upon general tests and abstract constitutional propositions instead of focusing on the precise factual scenario confronted by the officers." *Id.*

Like the two officers in *Mueller* who "made no decisions at all," *id.* at 1189, the Stayton officers similarly made no

independent decisions regarding protective custody and merely assisted DHS in securing the children. We thus decline to find that the Stayton officers were either plainly incompetent or that they knowingly violated the law when they relied on DHS's determination that Sjurset's children were in imminent danger.

To hold otherwise would place the Stayton officers in a Catch-22 situation: either challenge DHS's determination, which could potentially endanger the children's safety and put the officers at risk of liability or discipline if harm had befallen the children, or carry out DHS's instructions in the absence of a court order at the risk of being sued for violating the children's and the parents' constitutional rights. The correct answer would not be obvious to a reasonable officer. Thus, the "contours" of the Fourteenth and Fourth Amendment rights at issue were not clearly established in this context. Accordingly, for the purposes of qualified immunity, those rights did not preclude the officers' reliance on DHS's determination.

The district court, however, held that Sjurset had "successfully raised a question of fact" as to whether the Stayton officers had violated clearly established law. Our analysis above explains why we respectfully disagree. But even if we were to assume that the Stayton officers did violate clearly established law in entering the home and removing the children at the direction of the DHS officials, we would nevertheless conclude that the Stayton officers acted reasonably under the circumstances and would therefore be entitled to qualified immunity. *See Blankenhorn v. City of Orange*, 485 F.3d 463, 471 (9th Cir. 2007) (noting that "even if the violated right was clearly established, . . . if the officer's mistake as to what the law requires is reasonable,

. . . the officer is entitled to the immunity defense") (second alteration in original) (quoting *Motley*, 432 F.3d at 1077) (brackets and internal quotation marks omitted).

Part of the district court's rationale in ruling to the contrary was because the Stayton officers "did not rely on the word of a fellow police officer, but rather that of a DHS worker."  But this view is contrary to well-established precedent, which holds that "[l]aw enforcement officers *and agencies* are entitled to rely *on one another* to a certain extent." *Guerra v. Sutton*, 783 F.2d 1371, 1375 (9th Cir. 1986) (emphases added) (holding that, in the interagency context where "[t]he system requires reasonable cooperation and division of labor, . . . the INS may reasonably rely on the statement of a responsible law enforcement officer").

The district court's refusal to extend this reliance principle is also undercut by *Mueller II*, in which we held that the detective's reliance on the opinions of several doctors was objectively reasonable under the circumstances.  700 F.3d at 1188 (noting that "[r]easonableness must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight . . . ." (quoting *Ryburn v. Huff*, 132 S. Ct. 987, 992 (2012)) (internal quotation marks omitted)).  This reliance principle is particularly applicable here because the officers were acting at the direction of DHS, the very agency with subject-matter expertise and authority to make child-welfare determinations.  *See* Or. Rev. Stat. §§ 409.185(1), 419B.150(1)(a).

Sjurset correctly points out, however, that an officer cannot blindly rely on the existence of a protective-custody determination to avoid liability.  Instead, Sjurset argues, the Stayton officers had a "duty to inquire" into the specific facts

surrounding DHS's decision to take the children into
protective custody.  Sjurset supports this argument with
precedent holding that officers "must make reasonable
inquiries to determine if there is a sufficient basis for the
entry and search." *Espinosa*, 598 F.3d at 535; *see also
Guerra*, 783 F.2d at 1375 ("An INS agent who conducts a
search or makes an arrest without knowledge of the details of
the warrant under which he presumes to act violates clearly
established law.").

But such a duty to make reasonable inquiries is
necessarily linked to the second prong of the *Saucier* test, i.e.,
whether the "conduct was unlawful in the circumstances of
the case." *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  The
reasonableness of an officer's conduct is thus context-
sensitive and dependent upon the details known to the officer
at the time of the search.

Focusing on the case at hand, Sjurset argues that "[t]here
were no facts known to the police officers that would have
allowed them to believe the children were in danger of
imminent harm," and "[t]here was no evidence that N.S. and
T.B. were in imminent danger of being harmed within the 36
hours that the police claim it would have taken to obtain a
court order."  But the record shows otherwise.  In addition to
the fact that DHS had already made a definitive protective-
custody determination, the Stayton officers were aware that
the children's mother had tested positive for
methamphetamine and other drugs and had previously been
convicted of child endangerment based on an incident
involving similar conduct.  They also witnessed first-hand
Sjurset's and Borchers's refusals to permit any official from
meeting with or speaking to the children, effectively
preventing the officers from verifying the children's safety.

Finally, the Stayton officers knew that a warrant could not be procured for at least 36 hours, which amplified the perceived risk of jeopardizing the children's safety in the intervening period. The officers therefore were not acting blindly at the instruction of DHS; they had knowledge of the key details that informed DHS's determination. *See Guerra*, 783 F.2d at 1375 (holding that the duty to inquire requires an official to have "knowledge of the details of the warrant" on which he relies). In light of these circumstances, and given the potential harm of failing to act, their reliance on DHS's instruction was objectively reasonable.

Further supporting the objective reasonableness of the Stayton officers' conduct was the fact that they had no reason to believe that DHS's investigation was inadequate or incompetently performed. *See Motley v. Parks*, 432 F.3d 1072, 1081 (9th Cir. 2005) (en banc) ("[A]bsent some indication to a supervisor that an investigation was inadequate or incompetent, supervisors are not obliged to undertake *de novo* investigations or to cross examine subordinates . . . ." (quoting *Cecere v. City of N.Y.*, 967 F.2d 826, 829 (2d Cir. 1992)) (internal quotation marks omitted)). Instead, the Stayton officers knew that DHS had initiated an investigation based on a reliable tip from a doctor's office, had made several attempts to carry out its investigation, and had been prevented from doing so by Sjurset and Borchers.

The Stayton officers were therefore not incompetent in believing that they were legally authorized to act in reliance on DHS's determination. And even if the officers were mistaken in their belief that they could remove the children at the direction of DHS without court authorization, their actions were objectively reasonable under the circumstances.

Accordingly, the Stayton officers are entitled to qualified immunity.

### III.  CONCLUSION

For all of the reasons set forth above, we **REVERSE** the judgment of the district court with regard to the Stayton officers and **REMAND** the case to the district court for entry of judgment in their favor.