**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DONALD YORK EVANS,
    *Plaintiff*,

  and

JOHN WITHEROW,
    *Plaintiff-Appellant*,

    v.

HOWARD SKOLNIK; DON HELLING;
WILLIAM DONAT; BRIAN HENLEY,
    *Defendants*,

INMATE CALLING SOLUTIONS;
EMBARQ; GLOBAL TEL LINK,
    *Defendants*,

  and

LEA BAKER,
    *Defendant-Appellee*,

I. CONNALLY, [376] Suggestion of
Death,
    *Defendant-Appellee.*

No. 18-17233

D.C. No.
3:08-cv-00353-
RCJ-CBC

OPINION

Appeal from the United States District Court
for the District of Nevada
Robert Clive Jones, District Judge, Presiding

Argued and Submitted May 22, 2020
San Francisco, California

Filed May 18, 2021

Before:  Marsha S. Berzon and Sandra S. Ikuta, Circuit
Judges, and Ivan L.R. Lemelle,[*] District Judge.

Opinion by Judge Ikuta;
Partial Concurrence and Partial Dissent by Judge Berzon

## SUMMARY[**]

### Prisoner Civil Rights

The panel affirmed the district court's summary judgment
for a prison officer based on qualified immunity in an action
brought pursuant to 42 U.S.C. § 1983 alleging that between
2007 and 2008 defendant violated plaintiff's Fourth
Amendment rights by monitoring his phone calls to an
attorney plaintiff had engaged to bring lawsuits on his behalf.

---

[*] The Honorable Ivan L.R. Lemelle, United States District Judge for
the Eastern District of Louisiana, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has
been prepared by court staff for the convenience of the reader.

The panel exercised its discretion to consider only the second prong of the qualified immunity analysis: whether defendant's conduct in initially screening and occasionally checking in on plaintiff's legal calls with an attorney not representing him in a criminal matter violated a Fourth Amendment right that was clearly established at the time. The panel held that this conduct did not violate a clearly established right. The panel held that plaintiff had not cited any precedent that had placed the question beyond debate. There was no Supreme Court case considering whether a prison official's monitoring of an inmate's legal calls in this manner violated an inmate's Fourth Amendment rights. Nor had plaintiff pointed to any Ninth Circuit precedent holding that monitoring the beginning of an inmate's calls to ensure their legal character and then intermittently checking on those calls to confirm their continuing legal character violated a prisoner's Fourth Amendment rights.

Because the panel held that defendant was entitled to qualified immunity, the panel declined to address the merits of plaintiff's Fourth Amendment claim. Nevertheless, the panel briefly responded to the concurrence's argument that plaintiff's claim warranted a merits decision even though such a decision could not affect this case's outcome. The panel stated that first, this case was highly fact bound and would provide little guidance for future cases. Second, addressing the merits of plaintiff's Fourth Amendment claim could result in confusion rather than clarity. Finally, the circumstances mentioned by the Supreme Court that weighed in favor of deciding a constitutional issue were not present here.

Concurring in part, dissenting in part, and concurring in the judgment, Judge Berzon wrote separately because she

believed that, before addressing the second prong of the qualified immunity inquiry, the panel should have held that defendant's monitoring of plaintiff's legal calls did violate his constitutional rights under the Fourth Amendment.

## COUNSEL

Anne St. Amant (argued) and Zuzana Menzlová (argued), Certified Law Students; Gregory C. Sisk (argued), Supervising Attorney; University of St. Thomas School of Law, Appellate Clinic, Minneapolis, Minnesota; for Plaintiffs-Appellant.

D. Randall Gilmer (argued), Chief Deputy Attorney General; Frank A. Toddre II, Senior Deputy Attorney General; Aaron D. Ford, Attorney General; Aaron D. Ford, Attorney General; Attorney General's Office, Las Vegas, Nevada; for Defendants-Appellees.

Donald Specter and Corene T. Kendrick, Prison Law Office, Berkeley, California; David J. Fathi, ACLU National Prison Project, Washington, D.C.; Lawrence Fox, Ethics Bureau at Yale, New Haven, Connecticut; Sherri Royster, ACLU of Nevada, Las Vegas, Nevada; Mary Ann Scali, National Juvenile Defender Center, Washington, D.C.; Robin Wechkin, Sidley Austin LLP, Seattle, Washington; for Amici Curiae Prison Law Office, American Civil Liberties Union, ACLU of Nevada, Ethics Bureau at Yale, National Association of Criminal Defense Lawyers, and National Juvenile Defender Center.

Elliot Dolby Shields and Robert Rickner, Chairs, Civil Rights & Liberties Committee, New York County Lawyers Association, New York, New York, for Amicus Curiae Civil Rights and Liberties Committee of the New York County Lawyers Association.

**OPINION**

IKUTA, Circuit Judge:

This appeal requires us to address whether John Witherow, a former inmate at a now-closed Nevada State Prison, can recover damages from Lea Baker, an officer at the prison. As required by prison policy, Baker screened and intermittently checked in on Witherow's phone conversations with the attorney he had hired to bring lawsuits on his behalf. Because Baker did not violate any Fourth Amendment right that was clearly established at the time of her challenged conduct, we hold that she is entitled to qualified immunity.

I

This case has a long history, including two prior appeals to this court. The case began in 2008, when Witherow was an inmate in a Nevada Department of Corrections (NDOC) facility. He and his lawyer brought a joint civil action under 42 U.S.C. § 1983 against a range of defendants claiming they had violated Witherow's Fourth Amendment rights and engaged in unlawful wiretapping. Witherow alleged the prison was monitoring his calls to the attorney he had engaged to help with his civil actions. A series of pretrial rulings resulted in the dismissal of all parties except for Witherow and two NDOC officers, Lea Baker and Ingrid

Connally.**[1]**   After a three-day jury trial in 2013, the jury returned a verdict for defendants on Witherow's wiretapping claim.   In 2014, the district court dismissed Witherow's claims against Baker and Connally for damages and injunctive and declaratory relief.

On appeal, we reversed the district court's dismissal of Witherow's Fourth Amendment claim against Baker and Connally in an unpublished opinion. *Evans v. Skolnik*, 637 F. App'x 285, 288 (9th Cir. 2015).**[2]**   We rejected the district court's holding that Witherow lacked a subjective expectation of privacy because he was aware NDOC was screening his calls.   Instead, the district court should have made a "normative inquiry" regarding the scope of Witherow's Fourth Amendment rights. *Id*. But because Witherow was a prisoner, "the fact that the NDOC's practice implicated the Fourth Amendment does not mean that Witherow's constitutional rights were necessarily violated." *Id*.   We directed the district court to consider on remand whether "NDOC's practice of initially screening and occasionally 'checking in' on [Witherow's] legal calls was not 'reasonably related to legitimate penological interests,'" *id.* (citing *Turner v. Safley*, 482 U.S. 78, 89 (1987)), and whether there were

---

**[1]** Witherow's Second Amended Complaint listed 116 causes of action against numerous defendants.  The district court dismissed certain claims as a matter of law and entered judgment in favor of the defendants on other claims after a jury trial.

**[2]** We affirmed the dismissal of Witherow's Fourth Amendment claim against Baker and Connally's supervisors, though we stated that if on remand the district court determined that Baker and Connally had violated Witherow's Fourth Amendment rights, the court should "consider whether the supervisory officials are liable for their failure to intervene." *Skolnik*, 637 F. App'x at 288.

"alternative prison policies that could satisfy" the relevant penological objectives, *id*. (quoting *Demery v. Arpaio*, 378 F.3d 1020, 1028 n.2 (9th Cir. 2004)).

On remand, the district court again dismissed Witherow's Fourth Amendment claim against Baker and Connally. On Witherow's second appeal, we reversed the dismissal due to a procedural error and remanded once again. *Evans v. Baker*, 691 F. App'x 488, 489 (9th Cir. 2017).

While the case was pending before the district court, Connally died. Baker, the sole remaining defendant, moved for summary judgment on Witherow's Fourth Amendment claim. The district court granted her motion, holding that Baker was entitled to qualified immunity because (1) Baker had not violated Witherow's Fourth Amendment rights, and (2) if she had violated any such right, that right was not clearly established. This third appeal followed.

II

Witherow claims that Baker's conduct in monitoring his legal calls to the attorney representing him in civil actions against the prison violated his Fourth Amendment rights. Because the district court granted Baker's motion for summary judgment, we view the evidence in the light most favorable to Witherow. *See Espinosa v. City & County of San Francisco*, 598 F.3d 528, 532 (9th Cir. 2010).

Between May 2007 and January 2008, Baker was a correctional officer at Nevada State Prison. During that time, she was regularly assigned to Unit 13, the disciplinary segregation unit, where Witherow was housed. Inmates in

Unit 13 were not permitted outside their cells except in limited circumstances.

As part of her assignment, Baker was responsible for monitoring telephone calls. Because inmates in Unit 13 were confined to their cells, they had to make their personal and legal phone calls from within those cells using a portable phone provided by prison officials instead of using wall-mounted phones. Unit 13 consisted of two 30-prisoner units, with one portable phone for each unit. Inmates wishing to make legal calls would fill out a form identifying the name and phone number of their legal representative. When the portable phone was available, an officer would hand the phone to the inmate who had requested it, and the inmate would make the call from his cell.

At the time Baker was working in Unit 13, the portable phones did not have a caller identification function. This meant that an inmate could purport to make a legal call but actually make a personal call, or make a legal call first and then make personal calls. And if an inmate engaged in lengthy personal calls, it could deprive other inmates from using the portable phone. Officers were not allowed to monitor the calls by standing close to the cells because of the risk they could overhear privileged information.

To avoid improper use of the portable phones, NDOC instituted various procedures that Baker followed.[3] The prison control center was equipped with speakers that were wired into the portable phone lines. This allowed officers to

---

[3] These procedures were implemented only for legal calls. Personal calls did not receive the same protections, and were recorded by the NDOC.

listen to the conversation on the phone by flipping a switch. Baker would listen to the beginning of a legal call to confirm its legal character. After the inmate dialed the number, she would wait until an attorney, secretary, or receptionist from a law office or other professional office answer the phone. She would then switch off the speaker. She stated that she was not allowed "to listen to legal calls for longer than it took to identify the party receiving the phone call" and did "not recall ever listening to a legal call for longer than it took to initially screen" the call. Inmates were allowed 20 minutes on most calls, and other inmates might be waiting for the phone. Therefore, Baker would switch the speaker back on after some time had passed to see if the inmate was still making a legal call. If Baker turned on the speaker "and determined that [the inmate] was still making a legal call" she would turn the switch off. Baker did not recall hearing any attorney-client communication between Witherow and his attorney.

III

A

We review a district court's grant of summary judgment based on qualified immunity de novo. *Sandoval v. Las Vegas Metro. Police Dep't*, 756 F.3d 1154, 1160 (9th Cir. 2014). A government official is entitled to qualified immunity from a claim for damages unless the plaintiff raises a genuine issue of fact showing (1) "a violation of a constitutional right," and (2) that the right was "clearly established at the time of [the] defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

"We may address these two prongs in either order," *Sandoval*, 756 F.3d at 1160, but this was not always the case. In *Saucier v. Katz*, the Supreme Court required courts to determine whether a plaintiff's allegations established a violation of a constitutional right before determining whether that right was clearly established.  533 U.S. 194, 201 (2001). *Saucier* adopted this two-step procedure "to support the Constitution's 'elaboration from case to case' and to prevent constitutional stagnation." *Pearson*, 555 U.S. at 232.  But the Supreme Court soon changed course, ruling that the sequence of review set out in *Saucier* was not mandatory and courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Id.* at 236.

*Pearson* explained that "experience has pointed up" the shortcoming of *Saucier*'s "inflexible procedure."  *Id.* at 233–34.  As a jurisprudential matter, adhering to "*Saucier*'s two-step protocol departs from the general rule of constitutional avoidance and runs counter to the 'older, wiser judicial counsel not to pass on questions of constitutionality . . . unless such adjudication is unavoidable.'" *Pearson*, 555 U.S. at 241 (quoting *Scott v. Harris*, 550 U.S. 372, 388 (2007) (Breyer, J., concurring)).  Resolving a difficult constitutional issue instead of resolving the often easier question whether a right is clearly established "sometimes results in a substantial expenditure of scarce judicial resources on difficult questions that have no effect on the outcome of the case."  *Id.* at 236–37.  Moreover, "[u]nnecessary litigation of constitutional issues also wastes the parties' resources," and "*Saucier*'s two-step protocol disserves the purpose of qualified immunity when it forces the parties to endure additional burdens of suit—such as the

costs of litigating constitutional questions and delays attributable to resolving them—when the suit otherwise could be disposed of more readily." *Id.* at 237 (cleaned up). Further, "[t]here are circumstances in which the first step of the *Saucier* procedure may create a risk of bad decisionmaking," such as when "the briefing of constitutional questions is woefully inadequate." *Id.* at 239. Finally, "although the first prong of the *Saucier* procedure is intended to further the development of constitutional precedent, opinions following that procedure often fail to make a meaningful contribution to such development," particularly where the constitutional question is "so factbound that the decision provides little guidance for future cases." *Id.* at 237.

Although the *Saucier* protocol "should not be regarded as mandatory in all cases," *Pearson* recognized two circumstances where reaching the constitutional issue first would be beneficial: cases in which the court cannot readily decide "whether a right is clearly established without deciding precisely what the existing constitutional right happens to be," and cases involving "questions that do not frequently arise in cases in which a qualified immunity defense is unavailable." *Id.* at 236 (citation omitted). "Heeding [this] guidance," the Supreme Court subsequently held that police officers did not use excessive force in violation of the Fourth Amendment when they shot two suspects after a car chase, and therefore were entitled to qualified immunity. *Plumhoff v. Rickard*, 572 U.S. 765, 774 (2012). The Court concluded that reaching the constitutional issue was beneficial in "'develop[ing] constitutional precedent' in an area that courts typically consider in cases in which the defendant asserts a qualified immunity defense." *Id.* (quoting *Pearson*, 555 U.S. at 236).

But despite acknowledging circumstances when defining constitutional rights is "beneficial to clarify the legal standards governing public officials," the Court has made clear that "[i]n general, courts should think hard, and then think hard again, before turning small cases into large ones" by resolving a constitutional question despite the plaintiff's inability to establish a violation of a clearly established right. *Camreta v. Greene*, 563 U.S. 692, 707 (2011); *see also D.C. v. Wesby*, 138 S. Ct. 577, 589 n.7 (2018) ("We continue to stress that lower courts should think hard, and then think hard again, before addressing both qualified immunity and the merits of an underlying constitutional claim." (cleaned up)). We have likewise relied on this principle. *See O'Doan v. Sanford*, 991 F.3d 1027, 1036 (9th Cir. 2021) (exercising our discretion to resolve a case on the second ground because "no clearly established law shows that the officers' conduct was unconstitutional," and citing *Wesby* for the proposition that we "should think hard, and then think hard again, before reaching the merits of an underlying constitutional claim").

B

In considering what constitutes "clearly established" law for purposes of qualified immunity, the Supreme Court has taken a narrow approach. A government official "violates clearly established law when, at the time of the challenged conduct, [t]he contours of [a] right [are] sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011) (cleaned up). "Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Brosseau v. Haugen*,

543 U.S. 194, 198 (2004). Thus, cases decided after the relevant conduct are "of no use in the clearly established inquiry." *Id*. at 200 n.4.

Although the Supreme Court "does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017)). "This demanding standard protects all but the plainly incompetent or those who knowingly violate the law." *Wesby*, 138 S. Ct. at 589 (cleaned up). In determining whether this standard is met, the Court considers whether there are "cases of controlling authority" in the plaintiffs' jurisdiction at the time of the incident "which clearly established the rule on which they seek to rely," or "a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful." *Wilson v. Layne*, 526 U.S. 603, 617 (1999).

Under this rule, our analysis is straightforward if "the right is clearly established by decisional authority of the Supreme Court or this Circuit." *Boyd v. Benton County*, 374 F.3d 773, 781 (9th Cir. 2004). Where such binding precedent exists, "our inquiry should come to an end." *Id.* If such binding precedent is lacking, we have considered other sources "including decisions of state courts, other circuits, and district courts." *Id.* (cleaned up). The Supreme Court has not clarified when state and district court decisions could place a "statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741. Rather, as the Supreme Court has pointed out, "district court decisions—unlike those from the courts of appeals—do not necessarily settle constitutional standards," because "[a] decision of a federal district court

judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case." *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011); *see also Wilson*, 526 U.S. at 616 (finding no clearly established law where the only cases cited were a state intermediate court decision and two unpublished district court decisions). We have been somewhat hesitant to rely on district court decisions in this context. *See, e.g.*, *S.B. v. County of San Diego*, 864 F.3d 1010, 1016 (9th Cir. 2017) (rejecting plaintiffs' argument that two district court decisions provided clearly established law, and noting that district court decisions "do not necessarily settle constitutional standards"); *Hamby v. Hammond*, 821 F.3d 1085, 1095 (9th Cir. 2016) (same); *Marsh v. County of San Diego*, 680 F.3d 1148, 1159 (9th Cir. 2012) (holding that under the facts of that case, "the opinions by a federal district court and an intermediate state court are insufficient to create a clearly established right").

The Supreme Court has also warned us not to find clearly established law "lurking in the broad 'history and purposes of the Fourth Amendment,'" or in "broad historical assertions." *al-Kidd*, 563 U.S. at 742 (quoting *al-Kidd v. Ashcroft*, 580 F.3d, 949, 971 (9th Cir. 2009)). The Supreme Court has "repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality." *Id.* (citation omitted); *see also Wood v. Moss*, 572 U.S. 744, 748 (2014). In short, "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments." *al-Kidd*, 563 U.S. at 743 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

IV

In this case, we exercise our discretion to consider only the second prong of the qualified immunity analysis: whether Baker's conduct in "initially screening and occasionally 'checking in' on [Witherow's] legal calls" with an attorney not representing him in a criminal matter, *Skolnik*, 637 F. App'x at 288, violated a Fourth Amendment right that was clearly established at the time.

We conclude it did not. Witherow has not cited any precedent that has "placed the statutory or constitutional question beyond debate." *Kisela*, 138 S. Ct. at 1152 (citation omitted). There is no Supreme Court case considering whether a prison official's monitoring of an inmate's legal calls in this manner violates the inmate's Fourth Amendment rights. Nor has Witherow pointed to any Ninth Circuit precedent holding that monitoring the beginning of an inmate's calls to ensure their legal character and then intermittently checking on those calls to confirm their continuing legal character violates a prisoner's Fourth Amendment rights.

Instead, Witherow primarily relies on an inapposite Ninth Circuit decision, *United States v. Van Poyck*, 77 F.3d 285 (9th Cir. 1996). *Van Poyck* held that prison officials do not violate an inmate's Fourth Amendment rights by implementing a policy of recording prisoners' personal calls. We reasoned that "[t]he Fourth Amendment is not triggered unless the state intrudes into an area 'in which there is a constitutionally protected reasonable expectation of privacy.'" *Id.* at 290 (quoting *New York v. Class*, 475 U.S. 106, 112 (1986)). Such an expectation of privacy exists "only if (1) the defendant has an 'actual subjective expectation of

privacy' in the place searched and (2) society is objectively prepared to recognize that expectation." *Id.* (quoting *United States v. Davis*, 932 F.2d 752, 756 (9th Cir. 1991)). We concluded that "neither expectation exist[ed]" because the prisoner was aware of the prison's monitoring policy and "no prisoner should reasonably expect privacy in his outbound telephone calls." *Id.* at 290–91. In a footnote, *Van Poyck* limited its holding to personal calls, stating that its "analysis does not apply to 'properly placed' telephone calls between a defendant and his attorney, which the [prison] does not record or monitor." *Id.* at 291 n.9. Because *Van Poyck* did not address the question whether the prison could record legal phone calls, it did not establish a Fourth Amendment right to protection from such conduct—let alone protection from intermittent monitoring of calls between an inmate and a lawyer hired to bring civil damages actions.

Witherow also cites our decisions in *Nordstrom v. Ryan*, 762 F.3d 903 (9th Cir. 2014) (*Nordstrom I*), and *Nordstrom v. Ryan*, 856 F.3d 1265 (9th Cir. 2017) (*Nordstrom II*). Given that Baker's conduct occurred during 2007 and 2008, six years before *Nordstrom I* was decided, these cases are "of no use in the clearly established inquiry." *Brosseau*, 543 U.S. at 200 n.4. Moreover, they address the question whether a prison's policy of reading a prisoner's mail to an attorney representing him in a criminal case violates a prisoner's rights under the First and Sixth Amendments. *Nordstrom I*, 762 F.3d at 909; *Nordstrom II*, 856 F.3d at 1272. They do not address whether initial and intermittent monitoring of attorney-client calls to attorneys representing an inmate in a civil case violates the Fourth Amendment. Accordingly, these cases are also inapposite.

Nor does Witherow show any "robust consensus of cases of persuasive authority," *City & County of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1778 (2015) (citation omitted), that placed this Fourth Amendment question "beyond debate" at the time of Baker's challenged conduct, *al-Kidd*, 563 U.S. at 741. Witherow cites cases that address attorney-client privilege generally, *see*, *e.g.*, *Upjohn v. Co. v. United States*, 449 U.S. 383 (1981), and federal common law attorney-client privilege in prison, *Gomez v. Vernon*, 255 F.3d 1118 (9th Cir. 2001). Such generalized discussions do not clearly establish any constitutional right that was violated here. *See al-Kidd*, 563 U.S. at 742; *Wood*, 572 U.S. at 748. "As we have made clear, [s]tanding alone, the attorney-client privilege is merely a rule of evidence; it has not yet been held a constitutional right." *Partington v. Gedan*, 961 F.2d 852, 863 (9th Cir. 1992), as amended (July 2, 1992); *see also Sanborn v. Parker*, 629 F.3d 554, 575 (6th Cir. 2010) ("A violation of the attorney-client privilege is not *itself* a violation of the United States Constitution or its law and treaties." (cleaned up)).

Witherow and his amici also cite multiple out-of-circuit, district court, and state court decisions. None is on point. Some fail to discuss the Fourth Amendment, others address only inspection of prisoner mail, others deal with communications between prisoners and attorneys representing them in criminal proceedings, and yet others involve the recording of entire calls, rather than intermittent monitoring.[4] A number of cases were decided after Baker's

---

[4] For example, *Browning v. MCI Worldcom, Inc.*, No. 3:00-cv-0633, Dkt. No. 248 (D. Nev. July 10, 2006), an unpublished order, addresses other NDOC defendants' practice of recording entire calls between attorneys and prisoners. Likewise, *Jayne v. Bosenko*, No. 2:08-cv-02767-

challenged conduct.    Indeed, most of the cases are distinguishable on more than one of these grounds.

Because "[a]n officer 'cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it," *Kisela*, 138 S. Ct. at 1153 (quoting *Plumhoff*, 572 U.S. at 778–79), the lack of any precedent establishing that Baker's conduct violated Witherow's Fourth Amendment rights, or indeed that Witherow has any Fourth Amendment rights in this context, compels the conclusion that Baker is entitled to qualified immunity.

V

Because we hold that Baker is entitled to qualified immunity, we decline to address the merits of Baker's Fourth Amendment claim.  *See Pearson*, 555 U.S. at 236.   Our discretion to "determine the order of decisionmaking that will best facilitate the fair and efficient disposition of each case" makes further explanation unnecessary.    *Id*. at 242. Nevertheless, we briefly respond to the concurrence's argument that Witherow's claim warrants a merits decision even though such a decision cannot affect this case's outcome.

The Supreme Court has rejected the concurrence's position that "[u]nless a decision on the [merits] would provide 'little guidance for future cases,' courts should . . .

---

MSB, 2014 WL 2801198 (E.D. Cal. June 19, 2014), was decided six years after Baker's challenged conduct and addresses the recording of entire attorney-client calls.

continue to develop constitutional precedent." Conc. at 24–25 (quoting *Pearson*, 555 U.S. at 237).**[5]** To the contrary, the Court has "left this matter to the discretion of lower courts, and indeed detailed a range of circumstances in which courts should address *only* the immunity question." *Camreta*, 563 U.S. at 707 (emphasis added). Many of those circumstances are present here.

First, this case is highly factbound and would provide "little guidance for future cases." *Pearson*, 555 U.S. at 237. Baker's alleged conduct was specific to the disciplinary segregation unit in the prison and the lack of technology available at the time.**[6]** Moreover, it involved merely the

---

**[5]** In arguing that courts should "continue to develop constitutional precedent," Conc. at 24–25, the concurrence echoes *Saucier*'s reasoning. *Saucier* explained that courts should address "the existence or nonexistence of constitutional right as the first inquiry," because "[t]he law might be deprived of this explanation were a court simply to skip ahead to the question whether the law clearly established that the officer's conduct was unlawful in the circumstances of the case." 533 U.S. at 201. But *Saucier* was superseded by *Pearson*, which concluded that "experience has pointed up [*Saucier*'s] shortcomings," and explained why a different approach was warranted in many circumstances. *See Pearson*, 555 U.S. at 233.

**[6]** The concurrence argues that this case is not factbound because "the constitutional question does not depend on the particular technology used." Conc. at 26. We disagree. The Supreme Court has recognized that changes in technology can have a significant effect on privacy interests protected by the Fourth Amendment. *See Riley v. California*, 573 U.S. 373, 393 (2014) (noting that advances in technology can increase intrusions into personal privacy). Here, the prison's procedure for monitoring legal calls by conducting periodic checks of prisoner phone calls was necessitated by the prison's use of old technology (in this case, portable phones lacking caller identification). Technological advances have eliminated the need to use this procedure, and therefore eliminated

"practice of initially screening and occasionally checking in on [Witherow's] legal calls," *Skolnik*, 637 F. App'x at 287, rather than the more common conduct of recording or monitoring entire phone calls. Whether a constitutional violation occurred will be "heavily dependent" on these facts, *Pearson*, 555 U.S. at 237 (quoting *Buchanan v. Maine*, 469 F.3d 158, 168 (1st Cir. 2006)), and there is little reason to think such facts will repeatedly occur. Witherow was released from prison in 2010 and the Nevada State Prison where he was incarcerated has since closed down. Prison officials stopped monitoring attorney-client calls in the manner alleged sometime before the prison closed, and there is no indication that other NDOC officials are engaging in similar conduct. Technology has changed, and prison officials are not likely to pass portable telephones into jail cells. Nor has Witherow presented us with any judicial decision, from any court, describing similar conduct. In sum, it is uncertain whether a merits ruling here will ever prove helpful in a future case.

Second, addressing the merits of Witherow's Fourth Amendment claim may result in "confusion rather than clarity." *Id*. (quoting *Scott*, 550 U.S. at 388 (Breyer, J., concurring)). Witherow failed to develop the basis for his theory that his Fourth Amendment rights were violated by the initial screening and occasional checking of his calls with his attorney, who was assisting Witherow to bring civil lawsuits. We have considered prisoners' communications with their attorneys "under various constitutional principles, including the First Amendment right to freedom of speech and the Fourteenth Amendment rights to due process and access to

---

the question whether the old procedure violated the prisoner's Fourth Amendment rights.

the courts," and adopted the rule that prisoner-attorney communications relating to the prisoner's *criminal case* are "within the scope of the Sixth Amendment right to counsel." *Nordstrom I*, 762 F.3d at 909.  But Witherow's failure to provide any reasoned basis for why the Fourth Amendment protection against unreasonable searches applies here weighs against reaching the merits.  *See Pearson*, 555 U.S. at 239. Our prior unpublished decision, on which the concurrence relies, Conc. at 29–30 & n.3, provides no support; it stated only that Witherow's Fourth Amendment rights were "implicated," which has no defined meaning in this context.[7] *See Skolnik*, 637 F. App'x at 288.  Witherow's reliance on evidentiary rules protecting a client's communications with his attorney from being introduced into evidence are likewise misplaced, as such a common law privilege is not protected by the Constitution. *See Partington*, 961 F.2d at 863 (holding that "the scope of the privilege is a function of state law, not federal constitutional law").  As *Pearson* makes clear, we should not address an avoidable constitutional issue when the briefing is inadequate.  555 U.S. at 239.  Otherwise, we waste our resources in resolving issues with "no effect on the outcome of the case."  *Id*. at 237.[8]

---

[7] Based on this language alone, the concurrence concludes that Witherow's Fourth Amendment rights were violated.  Conc. at 29–30. But as the concurrence notes, our precedent is "silent on the Fourth Amendment implications here," Conc. at 30 n.3, and the unpublished decision it relies on does not explicitly hold that there was a Fourth Amendment violation, let alone articulate any reasoning supporting one. *Skolnik*, 637 F. App'x at 288.

[8] Indeed, even if the Fourth Amendment applied to Witherow's claims, the Supreme Court's determination that "[p]rison administrators . . . and not the courts, [are] to make the difficult judgments concerning institutional operations," and its adoption of a rational-basis test to evaluate prison rules, *Turner v. Safley*, 482 U.S. 78, 89 (1987), makes it

Finally, the circumstances mentioned by the Supreme Court that weigh in favor of deciding a constitutional issue are not present here. *See id*. at 236. First, we can resolve the qualified immunity question without delineating the contours of the constitutional right at issue. *Id.* Given the failure of the parties to cite any applicable case, it is easy to conclude that there was no clearly established Fourth Amendment right that Baker violated. Second, this is not a case involving questions unlikely to arise except when qualified immunity is available, *see id.*, because prisoners may bring actions for declaratory and injunctive relief to challenge prison conduct alleged to violate their Fourth Amendment rights. *See*, *e.g.*, *May v. Baldwin*, 109 F.3d 557, 565 (9th Cir. 1997); *Michenfelder v. Sumner*, 860 F.2d 328, 332–33 (9th Cir. 1988); *Grummett v. Rushen*, 779 F.2d 491, 495–96 (9th Cir. 1985). Were Witherow currently incarcerated and subject to a call monitoring policy like the one before us, he could seek such relief. A prison term is not inherently transitory such that every prisoner's demand for injunctive and declaratory relief would "run the same high risk of mootness as occurred with Witherow's declaratory and injunctive claims here," as

---

unlikely that a court would conclude that Witherow's constitutional rights were violated. The concurrence concludes that the prison's call-monitoring practice would fail this rational-basis test because there were "readily available alternative[s]" that would fully accommodate his rights. Conc. at 32–33. But the concurrence fails to analyze the alternative channels through which inmates can engage in confidential communications with their attorneys (such as face-to-face discussions or mail), or the ripple effect on prison operations that accommodation of the asserted right will have on prison resources, which *Turner* requires before a court disrupts "the difficult judgments concerning institutional operations [in prisons]." *See Turner*, 482 U.S. at 89.

the concurrence claims. Conc. at 27.**[9]** The concurrence also contends that because "[a]ny information gleaned from the phone calls may or may not be admissible under the rules of evidence . . . courts [in civil cases] are thus unlikely to reach the [Fourth Amendment] issue." Conc. at 27. But this further highlights that the conduct Witherow complains of raises evidentiary issues rather than a constitutional ones. *See Partington*, 961 F.2d at 863.

\*

We conclude that Baker is immune from Witherow's suit for damages based on the Supreme Court's admonition that qualified immunity attaches unless we identify precedent placing the constitutional right at issue "beyond debate" at the time of the challenged conduct. *Pauly*, 137 S. Ct. at 551 (citation omitted). And we decline to address the merits of Witherow's constitutional claim based on the Supreme Court's instruction that we "think hard, and then think hard again" before doing so. *Camreta*, 563 U.S. at 707.

**AFFIRMED.**

---

**[9]** We dismiss Witherow's claims for injunctive and declaratory relief as moot because Witherow is no longer incarcerated. *See Alvarez v. Hill*, 667 F.3d 1061, 1064 (9th Cir. 2012). Once Witherow was released, "[a]ny declaratory or injunctive relief ordered in [his] favor . . . would have no practical impact on [his] rights and would not redress in any way the injury he originally asserted." *Id.* (quotation omitted).

BERZON, Circuit Judge, concurring in part, dissenting in part, and concurring in the judgment:

I write separately because I believe that, before addressing the second prong of the qualified immunity inquiry, we should hold that Baker's monitoring of Witherow's legal calls did violate his constitutional rights under the Fourth Amendment.

I

The qualified immunity inquiry is two-pronged: the Court "must ask whether 'the officer's conduct violated a constitutional right' and whether 'the right was clearly established' at the time of the alleged misconduct." *Alston v. Read*, 663 F.3d 1094, 1098 (9th Cir. 2011) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part on other grounds by Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). The Court has "discretion [to] decid[e] which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236. The first prong of the *Saucier* procedure "promotes the development of constitutional precedent," *id.* at 236, and "prevent[s] constitutional stagnation," *id*. at 232.

"[T]he *Saucier* procedure 'is often beneficial' because it 'promotes the development of constitutional precedent and is especially valuable with respect to questions that do not frequently arise in cases in which a qualified immunity defense is unavailable.'" *Plumhoff v. Rickard*, 572 U.S. 765, 774 (2014) (quoting *Pearson*, 555 U.S. at 236). Indeed, unless a decision on the first prong would "provide[] little guidance for future cases," courts should, I strongly believe,

continue to develop constitutional precedent, to give better guidance to officers of the law so that they may better avoid violating rights guaranteed by the constitution. *Pearson*, 555 U.S. at 237. Otherwise, the lack of clearly established law becomes perpetual, as does the lack of incentive to avoid violations of constitutional rights in circumstances—such as this one—in which the Fourth Amendment exclusionary rule has little or no application. "Qualified immunity thus may frustrate 'the development of constitutional precedent' and the promotion of law-abiding behavior." *Camreta v. Greene*, 563 U.S. 692, 706 (2011) (quoting *Pearson*, 555 U.S. at 237); *see* Aaron L. Nielson & Christopher J. Walker, *The New Qualified Immunity*, 89 S. Cal. L. Rev. 1, 12 (2015) ("[M]any rights potentially might *never* be clearly established should a court 'skip ahead to the question whether the law clearly established that the officer's conduct was unlawful in the circumstances of the case.'" (quoting *Saucier*, 533 U.S. at 201)).

The majority contends that "[t]he Supreme Court has rejected" an approach that forwards the development of constitutional precedent. Op. at 18–19. That is not the Supreme Court law or the law in this circuit. Although *Pearson* held "that the *Saucier* protocol should not be regarded as mandatory in all cases," it explicitly "continue[d] to recognize that it is *often* beneficial." 555 U.S. at 236 (emphasis added). "*Pearson* concluded that courts 'have the discretion to decide whether that [*Saucier*] procedure is worthwhile in particular cases.'" *Plumhoff*, 572 U.S. at 774 (alteration in original) (quoting *Pearson*, 555 U.S. at 242).

For several reasons, I disagree with the majority's conclusion that this case presents circumstances under which we should "address only the immunity question." *Camreta v.*

*Greene*, 563 U.S. 692, 707 (2011). First, the constitutional question does not depend on the particular technology used in the disciplinary segregation unit and is thus not "so factbound that the decision provides little guidance for future cases." *Pearson*, 555 U.S. at 237. The underlying constitutional question on which the rest of this case depends is whether prisoners have a Fourth Amendment privacy interest in the content of attorney-client telephone calls related to civil cases. Both Baker's initial screen, which consisted of either waiting for the parties to identify themselves or listening for language Baker judged to "remotely sound[] legal in nature," and the periodic checks to determine whether the prisoners were "still making a legal call," included listening to at least some of the content of Witherow's calls. The specific phone system Baker used for monitoring is not relevant to the analysis of whether Witherow had a Fourth Amendment privacy interest in that content.

The majority further contends that "Witherow failed to develop the basis for his theory that his Fourth Amendment rights were violated," noting that our prior precedents have discussed prisoner-attorney communications under the First, Sixth, and Fourteenth Amendments, but not the Fourth. Op. at 20–21. But Witherow argues that both this Court's protection of the attorney-client privilege for prisoners under other Amendments and our case law supporting the privilege's "special place in the hierarchy of privacy expectations and Fourth Amendment protections" gave him a reasonable expectation of privacy in his phone calls with his attorney. Witherow's inability to cite precedent squarely on point for his specific circumstances is relevant to the "clearly established" analysis in the second *Saucier* prong, but cannot be sufficient to make his briefing "woefully inadequate" to

the extent that it weighs against deciding the first prong at all. *Pearson*, 555 U.S. at 249.

Finally, the issues here "do not frequently arise in cases in which a qualified immunity defense is unavailable," weighing in favor of addressing both *Saucier* prongs. *Id.* at 236. A prisoner's Fourth Amendment privacy interest in attorney phone calls about civil cases is unlikely to be raised in those civil cases themselves. Any information gleaned from the phone calls may or may not be admissible under the rules of evidence, but the Fourth Amendment exclusionary rule would rarely, if ever, apply, and courts are thus unlikely to reach the constitutional issue.[1] Although the majority puts weight on the potential for prisoners to bring actions for declaratory or injunctive relief, such actions run the same high risk of mootness as occurred with Witherow's declaratory and injunctive claims here, as prisoners are often transferred between institutions and institutional practices vary.

*Pearson* granted courts discretion; it did not require that no other avenues be available before we address the first *Saucier* prong. Instead, this Court "tend[s] to address both prongs of qualified immunity where the '"two-step procedure

---

[1] The framework for applying the exclusionary rule in specific types of civil cases derives from *United States v. Janis*, 428 U.S. 433 (1976), and requires courts to weigh the deterrence benefit of exclusion against the "loss of often probative evidence and all of the secondary costs that flow from the less accurate or more cumbersome adjudication." *I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032, 1041 (1984). This weighing is unlikely to lead to exclusion in a large majority of civil cases; in *Janis*, the Court noted that "[i]n the complex and turbulent history of the rule, the Court never has applied [the rule] to exclude evidence from a civil proceeding, federal or state." 428 U.S. at 447.

promotes the development of constitutional precedent" in an area where this court's guidance is . . . needed.'" *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 602 (9th Cir. 2019) (second alteration in original) (quoting *Mattos v. Agarano*, 661 F.3d 433, 440 (9th Cir. 2011) (en banc)). Given the unsettled nature of prisoners' privacy rights in phone calls with their attorneys, such guidance is needed here.

We therefore should address the first prong of the qualified immunity inquiry in this case. Bound by precedent, we correctly hold that Baker is entitled to qualified immunity because of the lack of "precedent placing the constitutional right at issue 'beyond debate' at the time of the challenged conduct." Op. at 23. Nor does any precedent since the time of the challenged conduct squarely establish a constitutional violation in this case, although the current caselaw points squarely in that direction.

We can and should provide clarity on the scope of inmates' rights moving forward. I would address whether Witherow had a Fourth Amendment right in properly placed legal calls to his attorney and conclude that he did.[2]

---

[2] Witherow's challenge to monitoring of his legal calls implicates the Fourth Amendment, not the Sixth, because those calls concerned Witherow's pending and potential civil lawsuits. As discussed below, had Witherow communicated with an attorney representing him in regard to a criminal case, monitoring of those legal calls would also violate the Sixth Amendment right to counsel.

II

A

Turning to that question, I note, first, that the issues before this panel on the Fourth Amendment claim are potentially narrowed by the disposition in the first appeal in this case. Evaluating alleged constitutional violations in the prison context, we conduct a "two-step analysis." *Hrdlicka v. Reniff*, 631 F.3d 1044, 1048 (9th Cir. 2011). "[W]e first determine whether any [constitutional] interest is implicated" by a prison practice or regulation, *id*., and second, if it is, such a "regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safely*, 482 U.S. 78, 89 (1987). *Turner* further held that "the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." *Turner* further held that "the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns."

It is the law of this case that the first step of this analysis is satisfied. "Under the law of the case doctrine a decision of the court in a prior appeal must be followed in all subsequent proceedings in the same case." *Eichman v. Fotomat Corp.*, 880 F.2d 149, 157 (9th Cir. 1989). The panel that heard the first appeal held that Witherow's Fourth Amendment rights were "implicated by the [prison's] practice of screening and monitoring inmates' attorney-client calls." *Evans v. Skolnik*,

637 F. App'x 285, 288 (9th Cir. 2015).**³** That panel reversed summary judgment for the defendants on the Fourth Amendment claim and remanded "for the district court to address [step two] in the first instance, giving particular attention to whether there are 'alternative prison policies that could satisfy [the prison's] objective[s]' in screening the calls." *Id.* (final alteration in original) (quoting *Demery v. Arpaio*, 378 F.3d 1020, 1028 n.2 (9th Cir. 2004)).

Although the earlier memorandum disposition in this case did not spell out its reasoning on the Fourth Amendment issue, a pair of Ninth Circuit decisions addressing inmates' legal mail confirm that Witherow's Fourth Amendment rights were violated here.

*Nordstrom v. Ryan* held that "the Constitution does not permit . . . reading outgoing attorney-client communication." 762 F.3d 903, 910–11 (9th Cir. 2014) (*Nordstrom I*) (emphasis omitted). *Nordstrom I* recognized that prison officials may "*inspect*[]" legal mail "in [the prisoner's] presence, to make sure that it does not contain, for example, a map of the prison yard, the time of guards' shift changes, escape plans, or contraband," *id*. at 910, but stressed that "*inspecting* letters and *reading* them are two different things," *id*. at 906. In a subsequent appeal, *Nordstrom II* held that Arizona's policy failed this test because it "call[ed] for page-

---

**³** Although binding on us as the law of the case, the prior panel's memorandum disposition, holding that this monitoring *did* implicate Witherow's Fourth Amendment rights, is unpublished and non-precedential. *See Grimm v. City of Portland*, 971 F.3d 1060, 1067 (9th Cir. 2020). Thus, our precedent will remain silent on the Fourth Amendment implications here, and give rise perpetually to grants of qualified immunity, unless we reach the Fourth Amendment issues in this case in a precedential opinion.

by-page content review of inmates' confidential outgoing legal mail." *Nordstrom v. Ryan*, 856 F.3d 1265, 1268 (9th Cir. 2017) (*Nordstrom II*). *Nordstrom I* and *Nordstrom II* stand for a clear proposition: reading the substance of attorney-client communications violates an inmate's constitutional rights. 762 F.3d at 910–11; 856 F.3d at 1272.

*Listening to* the substance of attorney-client communications violates an inmate's constitutional rights in the same way. Baker admitted that her monitoring included listening to the some of the substance of Witherow's legal calls. She testified that if the recipient of a call did not announce themselves as an attorney, which was likely in Witherow's case as he and his lawyer were on a first-name basis, Baker would listen to the substance of the call until she heard "[l]egal terminology" like "[l]awsuit, litigation, judge, attorney, client, privileged, any—any legal terminology that you might hear on television." This telephone monitoring is directly analogous to the unconstitutional practice in the *Nordstrom* cases, which involved a guard's reading the content of legal mail "to ensure that a letter concerns only legal subjects." *Nordstrom II*, 856 F.3d at 1272. "This is plainly not the type of inspection" that passes constitutional muster. *Id*.

*Nordstrom I* and *Nordstrom II* involved a criminal defendant's confidential communications with his attorney about a criminal case and so implicated the right to counsel under the Sixth Amendment. *See* 762 F.3d at 910. But attorney-client communications are no less confidential when they concern a civil case rather than a criminal one. Indeed, the reasoning in *Nordstrom I* relied on both the right to counsel *and* the privacy principles underlying attorney-client privilege. *See id*. *Nordstrom I* reasoned that "[i]t is obvious []

that a policy or practice permitting prison officials . . . to *read* an inmate's letters to his counsel is highly likely to inhibit the sort of candid communications that the right to counsel and the attorney-client privilege are meant to protect." *Id*.

The universally recognized confidentiality of attorney-client communications also establishes a reasonable expectation of privacy in the substance of those conversations under the Fourth Amendment. "[T]here is an enhanced privacy interest underlying the attorney-client relationship which warrants a heightened degree of judicial protection . . . ." *DeMassa v. Nunez*, 770 F.2d 1505, 1507 (9th Cir. 1985) (quoting *Law Offices of Bernard D. Morley v. MacFarlane*, 647 P.2d 1215, 1222 (Colo. 1982)). Witherow's legal calls concerned pending and potential lawsuits alleging civil rights violations by prison officials, including the same officials that monitored his legal calls. Whether under the Sixth Amendment, for criminal representation, or under the Fourth Amendment, for civil representation, and whether by mail or phone, inmates have a constitutional right to privacy in the substance of their attorney-client communications.

B

Turning to the second *Turner* prong, the district court erred on remand when it concluded that there were no "obvious, easy alternatives," *Turner*, 482 U.S. at 90, to monitoring the substance of Witherow's attorney-client calls. The district court did not address at all the readily available alternative of the existing telephone system used in every part of the prison other than Witherow's administratively segregated unit. That phone system automatically detected misuse, such as call forwarding or three-way conferencing, and prevented the recording or monitoring of calls placed to

telephone numbers that had been pre-registered and verified as belonging to attorneys. When combined with prison regulations that required a prison official, not the inmate, to dial the telephone number to ensure an attorney was actually called, this system served the prison's penological interests while "fully accommodat[ing] the prisoner's right[]" to privacy in communications with their counsel. *See id*. at 91. The record shows that the technology and equipment needed to implement this system in Witherow's segregated unit was either already in place or, under the existing agreement between the prison and the phone service provider, could be provided at no additional cost. In addition to being easy, obvious, and unburdensome, this alternative had the added feature of being *required by prison regulations* in place at the time, *see* Nev. Admin. Reg. § 722.11(4) (2008), and consistent with Nevada law providing that attorney-client calls placed by inmates are confidential, Nev. Rev. Stat. § 209.419(4) (2007). Because Witherow "can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests," Baker's practice of monitoring his legal calls "does not satisfy the reasonable relationship standard," and thus violated Witherow's Fourth Amendment rights. *Turner*, 482 U.S. at 91.

\*     \*     \*

It bears repeating that if courts routinely decline to reach the first prong of the qualified immunity inquiry, the development of constitutional precedent will be hamstrung. The resulting absence of clearly established law can allow for repeated civil rights violations with no accountability or guidance for state actors. Although *Pearson* permits courts deciding qualified immunity issues to decline to decide the constitutional issue raised, that permission is best exercised

in fact-specific cases, not where, as here, a generic and broadly applicable issue of constitutional law underlies the disputed issues. This panel should make clear to prison officials, going forward, that monitoring the substance of an inmate's properly placed legal calls is a constitutional violation.